PER CURIAM.
David James Martin appeals his convictions of first-degree murder and armed robbery and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm his convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On August 15, 2008, a grand jury indicted the appellant, David James Martin, on one count of first-degree murder and one count of armed robbery for the homicide of Jacey McWilliams. The charges against Martin resulted from his March 20, 2008, confession to police and the discovery of Jacey’s body shortly thereafter.
The evidence presented at trial revealed that on Thursday, March 13, 2008, Christine McWilliams called police to report that her daughter, Jacey McWilliams, was missing. Mrs. McWilliams was concerned because she had just learned that Jacey had not reported to work for two days, which was out of character for her daughter. Law enforcement began trying to trace Jacey’s movements since the last time she was seen, two days earlier on March 11, while working for the service department at a car dealership. Law en *288 forcement determined that the last time Jacey used her cellular phone was when she placed a phone call to her mother at 9:22 p.m. on March 11. During that conversation, Jacey informed her mother that she was out with a friend named David.
While at work on March 11, Jacey told a coworker that she would be spending the evening with David, who had planned a special night for them. The coworker had met Martin before as she, the coworker’s fiancé, Jacey, and Martin had gone out to play pool together a few weeks prior to March 11. The evidence revealed that after work on March 11, Jacey drove to Martin’s residence in Jacksonville, picked him up, and the pair headed to Black Creek in Middleburg, Florida. At that time, and relevant to this case, Martin did not own a car.
On March 17, four days after Jacey was reported missing, a police officer arrested Martin at a Wal-Mart in Pinellas County for shoplifting. After Martin was transported to the Pinellas County Jail, officers from the Clay County Sheriffs Office who were looking for Jacey coordinated their search efforts with officers from the Pinel-las Park Police Department, who confirmed that they had found Martin with Jacey’s car. Three days later, on March 20, detectives from the Clay County Sheriffs Office and Jacksonville Sheriffs Office convened at the Pinellas County Jail to question Martin about Jacey’s whereabouts. A third officer from the Clay County Sheriffs Office monitored the video that recorded Martin’s interrogation.
Detectives Ken West of the Clay County Sheriffs Office and Brian Wolcott of the Jacksonville Sheriffs Office questioned Martin. At this point in the investigation and interview, the detectives did not know whether Jacey was alive or dead. During trial, Detective West testified that his and Detective Wolcott’s primary objective in questioning Martin was to determine Ja-cey’s whereabouts. At the beginning of the interview, the detectives read Martin his Miranda[1] rights, which he waived.
Martin’s explanation of the last time he had been with Jacey evolved over the course of the interview. Initially, Martin stated that Jacey picked him up from his home in Jacksonville, and then, after spending the evening together, Martin dropped her off at her home, which was also located in Jacksonville. Martin stated that Jacey had given him permission to borrow her car to visit his girlfriend, and that he paid Jacey $50 in return. After taking Jacey home, Martin explained to the detectives that he then drove to St. Petersburg to spend time with his girlfriend. After a visit of two days, March 12-13, in St. Petersburg, Martin returned to Jacksonville. Before returning to see his girlfriend in St. Petersburg a second time, Martin went to his residence and packed all of his belongings into Jacey’s car because Martin and his girlfriend were planning to move to Georgia together soon thereafter.
Later during the interview, Martin’s story changed. Martin told detectives that Jacey had not loaned him her car to visit his girlfriend. Rather, she was unwilling to do so, and, as a result, a verbal altercation ensued. Martin said that he pushed Jacey out of her car and left her behind at Black Creek. He said that when he left in her car, she was alive.
Martin’s story continued to shift, and after approximately three-and-a-half hours of interviewing, Martin confessed to murdering Jacey. He said that on the evening in question he and Jacey were smoking cigarettes near Johns Cemetery Road in *289 Middleburg, Florida, when he told Jacey that he was going to get another cigarette from the car. While at this location, Martin was also communicating with his girlfriend on his cellular phone, who he said was “freaking out ... because [he] wasn’t home.” Martin said that he felt overwhelmed by his girlfriend’s “hurt” and he, in response, attacked Jacey. Rather than obtaining a cigarette from the car as Martin told Jacey he would, Martin retrieved a hammer and then used it to strike Jacey in the head multiple times. He stated that after the first blow, Jacey fell and appeared to be unconscious. He admitted that he continued to strike her, but was unsure of how many blows he inflicted. He described the incident as “a blur” and said that he “blacked out” while he attacked her. Martin then pulled Jacey, now deceased, into the bushes and departed in Jacey’s car. Martin said that he threw the hammer, along with Jacey’s phone, into a river.
Martin told the detectives where he left Jacey’s remains and then drew a map of the area for them. Shortly thereafter her body was located in the area Martin had described just off Johns Cemetery Road. The forensic pathologist who performed the autopsy on Jacey described her as being in an “advanced stage of postmortem decomposition.”
Martin stated that he killed Jacey because the “woman that [he] loved with all [his] heart was hurt so bad” and he had to go to her. Martin and his girlfriend had been exchanging calls and texts throughout the day. His girlfriend stated, and Martin confirmed, that she was concerned that Martin was pursuing a relationship with Jacey.
After Martin killed Jacey, bank records and video surveillance revealed that Martin used Jacey’s ATM card at a Domino’s Pizza and attempted to withdraw cash from her account. After the attack, Martin drove to his girlfriend’s home in St. Petersburg, arriving around 3 a.m, the next morning, March 12. She described Martin’s arrival as unexpected, and said that Martin seemed “very happy” and was “giddy” and “smiling.” During this visit to St. Petersburg, Martin drove his girlfriend to and from her job at a grocery store and slept at rest stops in Jacey’s car. That same day, Martin drove back to Jacksonville, and then returned to his girlfriend’s home two days later, on March 14.
His girlfriend testified that before Martin arrived at her residence in St. Peters-burg, she and Martin had joked about how he could visit her given that he did not own a car. His girlfriend testified that the following exchange took place:
STATE: Did the defendant say anything to you about how not having a car he could possibly get down to see you?
GIRLFRIEND: There was one point in time where we were just joking around with each other and he said, well, you know, I can just steal a car and I said, okay, well, how are you going to do that and he said, well, that’s easy. I’ll just kill them.
STATE: Now that conversation, was that two or three days before he actually showed up at your house?
GIRLFRIEND: It was very shortly before ....
STATE: After he said those words to you, well, that’s easy, I’ll just kill them, did you say anything back to him, joking back towards him?
GIRLFRIEND: Yes.
STATE: What did you say back?
GIRLFRIEND: I made a comment that — I told him a good place to hide a body is — and I told him a cemetery.
Martin confirmed that a similar exchange about stealing a car occurred as well, al *290 though he denied that any comments about killing someone were made.
Various experts testified as to what they found at the crime scene and the state of Jacey’s remains. A senior crime laboratory technician for the Florida Department of Law Enforcement testified that he found a cigarette butt, a white blanket, a suspected blood stain on the ground, a pair of eyeglasses, two flip-flops, and loose change strewn about the area where Ja-cey’s body was located. The laboratory technician also testified that Jacey’s shirt and sweatshirt were pulled up over her head, which suggested to him that Jacey’s body had been dragged to the area where police found it. The pockets in Jacey’s pants were also turned inside out.
A forensic pathologist testified that Ja-cey’s skull was cut and exhibited numerous fractures. Although the forensic pathologist was unable to estimate how many blows Jacey had suffered, a forensic anthropologist testified that based on her examination and reconstruction of Jacey’s skull (which comprised more than thirty-three fragments), Jacey was hit at least seven times. The anthropologist likened the blows to those she had seen at mass fatalities or car accidents. The forensic pathologist and anthropologist confirmed that Jacey died from blunt trauma to the head, and that injuries to her brain triggered a hemorrhage that resulted in death. The forensic anthropologist explained that based on the type of trauma Jacey suffered, she was hit by an object with a “curvilinear edge” that was “delivered with great force to the cranium.” The pathologist opined that Jacey was hit with a hammer. Although a hammer was recovered from Jacey’s vehicle, it tested negative for blood. As noted previously, Martin stated during the police interrogation that he threw the hammer used to kill Jacey into a river.
Against the advice of counsel, Martin testified on his own behalf. He denied killing Jacey and claimed that another man, an acquaintance who was Martin’s drug dealer, had killed Jacey in his presence. Martin testified that on the night of Ja-cey’s murder, he and Jacey went to his drug dealer’s residence. The drug dealer instructed that he and Jacey follow him to Johns Cemetery Road. Martin stated that once the three of them arrived at that location, the drug dealer pressured Martin to engage in sexual activity with him, but before this transpired, the trio became involved in a fight. Martin said that his drug dealer had previously forced him to perform sexual acts during prior drug exchanges between the two men. During the ensuing tussle, Martin stated that his dealer struck Jacey with a hammer, killing her, and then told Martin to “drag her body away.” Martin said that he dragged Jacey’s body to the bushes and covered her face with a white blanket. He said that his dealer told him to get rid of the hammer used to kill Jacey, so Martin threw it into a river on his way back to Jacksonville from St. Petersburg after visiting his girlfriend. Martin testified that he falsely confessed to the crime because his dealer, the actual murderer, had threatened to hurt his (Martin’s) mother and girlfriend if he told anyone what had happened. Martin said that at the time police interviewed him, he still feared for his mother’s and girlfriend’s safety. At trial, Martin did not have any other witnesses testify on his behalf. The jury found Martin guilty of one count of first-degree murder and one count of armed robbery.
During the penalty phase, the State argued three aggravators were present and offered victim-impact testimony from Ja-cey’s mother, Christine McWilliams. The parties stipulated as to the first aggrava *291 tor — that at the time of Jacey’s murder Martin was on felony probation. The second aggravator was that Martin committed the murder while engaged in the commission of a felony — armed robbery. The third aggravator was that Martin committed the murder in a cold, calculated, and premeditated (CCP) fashion without any moral or legal justification.
Martin presented testimony from eight witnesses. Martin’s mother testified that Martin experienced many physical and emotional problems growing up, that she suspected he had been sexually abused, that he used drugs, and that he would steal from her. She explained that one time Martin stole an air conditioner from her camper, and she reported his actions to law enforcement because she believed that if he went to jail, he would learn his lesson and stop using drugs. Martin’s felony-probation status, to which the parties stipulated, was a result of this incident. Martin’s mother also testified that Martin was on Prozac when he was seven years old, but that she took him off the medication because she did not believe it was necessary. A mental institution had prescribed the medication. Martin’s mother explained that she had been referred to this institution after she contacted the hospital because she was concerned that Martin had been sexually abused. Martin’s mother said that he was released from the mental institution on the medication after six weeks because Martin’s “lifetime maximum mental health insurance” had been exhausted. Martin’s mother also testified that the institution closed shortly thereafter for mistreating children.
Martin’s grandfather, ex-fiancée, friend, ex-girlfriend, stepsister, and stepbrother also testified on Martin’s behalf. Martin’s conditional release counselor, who counseled him after he was released from a juvenile facility at the age of thirteen, also testified. Martin declined to testify at the penalty phase. Martin also decided that he did not want Dr. Harry Krop, a forensic psychologist who had evaluated him, to testify on his behalf.
Following the penalty phase, the jury, by a vote of nine to three, recommended that the court impose a sentence of death for Jacey’s murder.
During the Spenceit[2] hearing, the testimony of several individuals was presented by the State including: Jacey’s mother, brother, and Janeen Dawn McWilliams.[3] Martin presented the testimony of his mother and she read a letter from her other son, Martin’s stepbrother. Defense counsel also submitted the deposition testimony of Dr. Krop to the trial court. '
After independently weighing the aggravating and mitigating circumstances, the court sentenced Martin to death for the murder of Jacey. In pronouncing Martin’s sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of three aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of felony probation, § 921.141(5)(a), Fla. Stat. (2008) (great weight); (2) the capital felony was committed while Martin was engaged in the commission of a robbery, § 921.141(5)(d), Fla. Stat. (2008) (great weight); and (8) the crime for which Martin was found guilty was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, § 921.141(5)(i), Fla. Stat. (2008) (great weight).
*292 The trial court addressed two statutory mitigators: Martin’s age, and additional factors in Martin’s background that would mitigate against imposition of the death penalty. The trial court found that the first mitigator was not proven by the defense. Martin was twenty-one years old at the time of the crime and demonstrated, during his police interview and trial, a level of “sophistication, intelligence, and understanding [to] directly rebut [this] claim.” See § 921.141(6)(g), Fla. Stat. (2008).
With regard to other factors in Martin’s background that would mitigate against imposition of the death penalty, see § 921.141(6)(h), Fla. Stat. (2008), the trial court found the following mitigating circumstances: (1) “drug abuse — suffered from substance abuse during his adolescent and adult life” (slight weight);[4] (2) lack of positive role models and the lack of the benefit of stable and nurturing parents during Martin’s formative years (slight weight); (8) lack of a violent history (slight weight); (4) incident was situational and his aberrant behavior was an isolated incident (slight weight); and (5) has family members who are concerned about him and love him (slight weight). The trial judge found the following mitigating factors not proven and gave them no weight: (1) emotional abuse; (2) sexual abuse; (3) led law enforcement to the crime scene and location of Jacey’s body;[5] (4) failure of the system;[6] (5) lack of impulse control; (6) has a reason to do well in prison; (7) exhibited a lack of sophistication in the way the crime was committed;[7] and (8) showed remorse.[8]
The trial court found that Martin proved six nonstatutory mitigating circumstances: (1) performed kind deeds for others (slight weight); (2) shares love and support with his family who continues to love him (slight weight); (3) attempted to have a positive influence on family members despite his incarceration (slight weight); (4) has artistic skills (slight weight); (5) cares about animals (slight weight); and (6) is amenable to rehabilitation and a productive life in prison (slight weight).
Recognizing that weighing aggravating and mitigating circumstances is not a mathematic comparison, but a qualitative assessment, the trial court concluded that the aggravating circumstances “far out-weighted]” the mitigating circumstances. The court found the jury’s recommendation of death was fully justified, and, therefore, imposed the death penalty for Jacey’s murder and thirty years of incarceration for Martin’s robbery conviction, to run concurrently.
This direct appeal followed.
ANALYSIS
Right to Remain Silent
In his first challenge, Martin contends that the trial court should have suppressed his statement to police. Martin asserts *293 that his statement was inadmissible because the police violated the Fifth Amendment when they failed to terminate the interview after Martin invoked his right to remain silent. He also contends that his confession is inadmissible because it was obtained through police coercion. We disagree.

Standard, of Review

According to this Court,
[ AJppellate courts should ... accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Miller v. State, 42 So.3d 204, 220 (Fla.2010) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)). “In addition, the State bears the burden to establish by a preponderance of the evidence that the confession was freely and voluntarily given.” Id.

Merits

The Fifth Amendment to' the United States Constitution states that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” As part of preserving this right, in Miranda v. Arizona the United States Supreme Court explained that
if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it — the threshold requirement for an intelligent decision as to its exercise.
384 U.S. 436, 467-68, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The right to remain silent is one of four procedural warnings that must be provided to a suspect who is taken into custody to protect his privilege against self-incrimination. These four warnings are that a suspect
must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
Miranda, 384 U.S. at 479, 86 S.Ct. 1602 (emphasis supplied); see also Traylor v. State, 596 So.2d 957, 966 (Fla.1992). “Once warnings have been given ... [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602.
Since Miranda, the U.S. Supreme Court and Florida courts have addressed the many ways in which suspects may invoke their right to terminate questioning. Protection of this right requires only that a suspect “indicate[ ] in any manner” that he no longer wants to be interrogated, and then the interrogation must cease regardless of whether it has yet to begin or already has begun. See 384 U.S. at 445, 86 S.Ct. 1602. Although the language “in any manner” may sound broad, this Court has clarified that this standard simply means that no “magic words” are necessary to invoke the right. See State v. Owen, 696 So.2d 715, 719 (Fla.1997).
In Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the U.S. Supreme Court addressed how law enforcement officers should respond when *294 a suspect is in custody and makes an “insufficiently clear” request for counsel. Id. at 454, 114 S.Ct. 2350. The Davis Court explained that the right to counsel established in Miranda was one of a “series of recommended ‘procedural safeguards’ ” that ensured the right against self-incrimination was protected. Id. at 457, 114 S.Ct. 2350 (quoting Michigan v. Tucker, 417 U.S. 433, 443-44, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). Because of this right’s “sufficient[ ] importf ] ... [it] ‘requires] the special protection of the knowing and intelligent waiver standard.’ ” Id. at 458, 114 S.Ct. 2350 (quoting Edwards v. Arizona, 451 U.S. 477, 483, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The Court noted that although it would be “good police practice” for interviewing officers to clarify a suspect’s request for counsel, officers are under no obligation to stop questioning a suspect because to do so “would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity.” Id. at 460, 114 S.Ct. 2350 (quoting Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)); see also Owen, 696 So.2d at 719 (noting that to require officers to ask clarifying questions placed “too great an impediment upon society’s interest in thwarting crime”).
In Owen, this Court held that the Davis analysis “applies as much to requests to terminate interrogation as it does to requests for counsel.” 696 So.2d at 718; see also Berghuis v. Thompkins, - U.S. -, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (“There is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel....”). This Court has held that if police provide proper Miranda warnings, they are not then required to clarify a suspect’s statement regarding his right to remain silent during an interrogation when the assertion made is ambiguous. See Cuervo v. State, 967 So.2d 155, 162 (Fla.2007) (affirming its holding in Owen that police need not ask clarifying questions following an ambiguous request to terminate an interrogation); Owen, 696 So.2d at 718.
In Owen, this Court noted that “requests for counsel have been accorded greater judicial deference than requests to terminate interrogation,” 696 So.2d at 718 n. 6, and it followed, therefore, “by even greater logic that the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his [or her] right to remain silent.” Id. (quoting State v. Williams, 535 N.W.2d 277, 285 (Minn.1995)). The Owen Court concluded that the defendant did not invoke his right to terminate questioning when he responded to a question about whether he had targeted the house at issue with the statement “I’d rather not talk about it” and, in response to a question about where he had placed a bicycle, stated “I don’t want to talk about it.” Id. at 717 n. 2. Both statements failed to indicate, unambiguously, whether the defendant was referring to the immediate topic of discussion or, instead, was invoking his Fifth Amendment right to remain silent. Id. at 720; see also Almeida v. State, 737 So.2d 520, 523 (Fla.1999) (addressing Owen’s “equivocal request” standard).
Both federal and Florida courts have repeatedly held that if a suspect in custody has made a knowing and voluntary waiver of his Miranda rights, an attempt to revoke that waiver thereafter must be unambiguous. See Davis, 512 U.S. at 460-61, 114 S.Ct. 2350; United States v. Mikell, 102 F.3d 470, 476 (11th Cir.1996); Cuervo, 967 So.2d at 163; Miles v. State, 60 So.3d 447, 451 (Fla. 1st DCA 2011); *295 Alvarez v. State, 15 So.3d 738, 743 (Fla. 4th DCA 2009). The standard under this rule is whether “a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.” Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994); see also Owen, 696 So.2d at 718.
In this case, the trial court did not err in denying Martin’s motion to suppress because police detectives informed Martin of his Miranda rights in “clear and unequivocal terms” and Martin, in response, did not indicate that he wished to invoke his right to remain silent. A detective read Martin his Miranda rights at the beginning of the interview. The same detective then asked Martin to sign the card from which he had just read Martin his rights. The card stated that by signing the card Martin indicated that he understood these rights.
Martin does not dispute that he waived his right to remain silent at the beginning of the interrogation. Instead, Martin contends that he asserted his right when he stated “I have nothing really to talk about” almost two hours after the interview began. Martin uttered[9] the disputed statement during the following exchange with Detectives Wolcott and West:[10]
WOLCOTT: Tell me where I can go get her. Do the right thing. It is very simple. I think what happened here was an accident David....
MARTIN: Let me tell you what, even if I could tell you where she’s at. The whole point about it’s an accident, people don’t give a fuck about that. It’s an accident, it’s whether or not ... I mean I don’t know what I am trying to say.
WOLCOTT: David, people do care. There is many a times that I have had cases where it was justified, excusable, there was not intent. Stuff like that, okay and it just disappeared. But you know what happened in all those cases. Everybody stepped up and told the truth. None of that can happen.
WEST: No one, you have zero shot, okay, by not telling the truth. That’s it. Okay. It’s not about that. My life is not any better if you go to prison. My life is not any better if you walk out of here. Okay, I don’t dislike you. Okay, we are not, you have never done, this is the first time we have ever met isn’t it?
MARTIN: Right.
WEST: W[e] got no beef. Okay the only beef I have is I have a job. I signed up for this job. It pays like crap but I do it. Okay, it can be rewarding. I can help families. Okay, I can do that kind of stuff. But what prohibits me from doing that is when I got the evidence and I got the people talking and they are not going like this. Okay, then *296 is when you start having problems. Do we need to have problems? Have I treated you bad?
MARTIN: Nope.
WEST: Have I disrespected you?
MARTIN: Not at all.
WEST: Do you feel like I am judging you wrong or anything?
MARTIN: No.
WOLCOTT: Then.
MARTIN: As a matter of fact you have something set in your head that you are trying to get to and I can’t help you get there.
WOLCOTT: But David, you can.
MARTIN: No, I can’t.
WOLCOTT: I think you have it in your head, okay, that you can’t help us. Okay, and maybe that is preventing you from wanting to help us, but at some point in your time son, you have got to let someone trust in you. You’ve got to sho[w] that there is a reason to trust in you. Okay? You cannot put the weight of this world on your shoulders. None of us can. Okay. Communication is big bro. Talking to people. Okay, spiritually, mentally, I mean it’s a relief. Okay, it’s a weight off man. It’s a weight off okay. It’s a relief for you to be able to lay down tonight in your bunk, okay. Knowing that you know what, that shit’s behind me.
MARTIN: You know what? I already feel that relief. You know why? Because I told you what I already told you.
WOLCOTT: David.
MARTIN: I have nothing really to talk about.
WOLCOTT: David you are not, okay, you may be saying that you are having it, okay, but your body is not saying that.
MARTIN: Because yall are putting me under a lot of pressure right now.
WOLCOTT: Okay, well it’s a pressure situation.
MARTIN: I know it is.
WOLCOTT: I don’t know how many times you have sat across from a homicide detective being questioned.
MARTIN: I never have.
WOLCOTT: And that is why I said today is the biggest day of your life. Okay, today can be a turning point for you. It can’t be a turning point by lying to us. Okay, I have been doing this job 11 years. Okay, the two of us have been doing this job longer than you have been alive. Okay, we have seen other young people make this same mistake. They think that there isn’t a way out that there is no light at the end of the tunnel and they can’t help themselves and they can. I am telling you they can, but you, David, cannot help yourself by not being truthful. You’ve got to. It’s that simple because.
(Emphasis supplied.)
As previously discussed, both this Court and the U.S. Supreme Court have held that an invocation of one’s right to remain silent must be made in clear and unequivocal terms if it follows a previous, knowing and voluntary waiver of one’s Miranda rights. See Davis, 512 U.S. at 460-61, 114 S.Ct. 2350; Cuervo, 967 So.2d at 163 (emphasizing that this Court’s holding in Owen regarding equivocal invocations “applies only where the suspect has waived the right to remain silent earlier during the session”) (quoting Almeida v. State, 737 So.2d 520, 523 n. 7 (Fla.1999)).
The transcript from Martin’s interview reveals that Martin did not make an unequivocal invocation. Rather, Martin uttered an ambiguous statement akin to that spoken by the defendant in Owen who, in response to an officer’s question regarding why he had entered a particular home, *297 answered “I’d rather not talk about it.” Owen, 696 So.2d at 717 n. 4. Martin, like the Owen defendant, did not unequivocally invoke his right to remain silent.
Before the exchange excerpted in this opinion transpired, Martin had been telling the detectives a fabricated story of what he and Jacey had been doing the last time he saw her. Martin disputed that he had hurt Jacey, telling the detectives that he dropped her off at home, and denied any knowledge of her whereabouts. The detectives, however, began to accuse Martin of being evasive and not telling them the whole story. Detective West informed Martin that Jacey’s cellular phone records did not comport with Martin’s story. Detective Wolcott noted it did not make sense that if Martin had left Jacey in a populated location as Martin claimed, she would not have sought the help of a nearby resident. In light of these statements, Martin’s story began to change.
Before Martin uttered the statement at issue, he told the detectives that he and Jacey had gotten into an altercation because she had refused to lend Martin her ear. Now, rather than taking Jacey home, Martin told law enforcement that he had pushed her out of the car and sped off, leaving Jacey, who was crying and yelling, behind. It was shortly after Martin provided this revised version of events that he made the statement “I have nothing really to talk about.” Given the responsive nature of the disputed statement, and the context in which it was made, it is reasonable that the interviewing detectives understood Martin’s statement to mean that he did not have more information as to Jacey’s whereabouts and her disappearance in general — not that he was ending the interview and invoking his right to remain silent.
This Court’s conclusion that Martin did not assert his right to remain silent is further supported by the fact that Martin’s statement came mid-interview, rather than at the beginning of it or following the colloquy regarding his Miranda rights. In contrast to this case, in Cuervo we held that the defendant had asserted his right to remain silent in part because his invocation “came solely in response to the inquiry concerning his Miranda rights, before any questions specific to the crime were asked.” 967 So.2d at 163. In light of the Cuervo defendant’s statement, we concluded that the interrogation should have ceased at that moment. Id. at 164. Martin’s statement, however, was in response to requests from the detectives to tell them where they could find Jacey, and his statement — “I have nothing really to talk about” — did not clearly indicate that he was invoking his right to remain silent. We cannot determine what in fact Martin meant by this statement, and it is equivocal at best.
In addition, and as previously discussed, the police interviewing Martin did not have an obligation to clarify this ambiguous assertion. As stated in Cuervo, “police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his Miranda rights.” 967 So.2d at 162 (quoting Owen, 696 So.2d at 719). We reaffirm that statement here.
Martin’s equivocal statement resulted in a non-assertion of his Fifth Amendment right to remain silent — his statement was not legally sufficient to invoke his right after he previously 'waived it, nor did it place the detectives on notice that they must cease questioning. We conclude, therefore, that Martin’s right to remain silent was not violated and affirm the trial court’s denial of his motion to suppress.
*298 A Voluntary and Admissible Confession

Standard of Review

A confession is inadmissible if it is involuntary. See Brewer v. State, 386 So.2d 232, 235 (Fla.1980); Coffee v. State, 25 Fla. 501, 510, 6 So. 493 (1889). The due process clause of the Fourteenth Amendment to the U.S. Constitution “prohibits the states from using the coerced confession of an accused against him.” Brewer, 386 So.2d at 235 (citing Brown v. Mississippi, 297 U.S. 278, 286-87, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). The standard to determine voluntariness in state prosecutions is the same as that which “applies to federal prosecutions under the [F]ifth [A]mendment privilege against self-incrimination.” Id. (citing Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).
The test to determine whether a confession is voluntary — in other words, not coerced — is whether it was the product of free will and rational choice. See Blake v. State, 972 So.2d 839, 844 (Fla.2007) (noting that “the salient consideration” is whether the defendant’s free will was overcome). This is determined based on “an examination of the totality of the circumstances surrounding the confession.” Traylor, 596 So.2d at 964; see also Blake, 972 So.2d at 844; Brewer, 386 So.2d at 237. In assessing the totality of the circumstances, a court must consider any promises or misrepresentations made by the interrogating officers. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (noting that misrepresentation by law enforcement is a relevant consideration in the totality-of-the-eircum-stances assessment).
In the instant case, Martin contends that his confession was involuntary and should have been suppressed by the trial court because it was coerced by the interviewing detectives. Martin alleges that the detectives relied upon the following six coercive tactics to induce his confession: The police (1) threatened him with the spectre of death row; (2) deluded him as to what he could expect for himself and from a jury if he confessed; (3) deceived him as to the amount of time he had to cooperate with law enforcement; (4) promised their favorable testimony and use of their influence during his trial if he cooperated; (5) promised to arrange a visit for him with his girlfriend if he cooperated; and (6) exploited his religious beliefs by relying on a version of the “Christian burial” interrogation technique.
When considering the facts, relevant standard of review, and totality of the circumstances, we do not agree with Martin that the detectives coerced his confession. Nevertheless, some of the techniques the detectives employed walked the line that separates permissible from impermissible interview tactics, and we, as a result, note that this case presents the very outer limit as to what tactics law enforcement may employ when performing a custodial interrogation.
In our analysis, we address each of Martin’s six claims and then assess them given the totality of the circumstances surrounding the interview. “As has often been stated, a trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Pagan v. State, 830 So.2d 792, 806 (Fla.2002). Applying this standard of review, we conclude that the detectives did not violate Martin’s Fifth Amendment right to remain silent because they did not induce a *299 coerced confession, and we uphold the denial of his motion to suppress.

Merits

Death Row, Fair Trials, and Testimonial Damnation
Martin first asserts that his confession was coerced because the interviewing detectives threatened him with the spectre of death row, implied that he would not receive a fair trial .unless he confessed, and threatened him with their testimonial damnation if he did not confess.
Martin relies on our opinion in Brewer, in which this Court upheld the trial court’s grant of a motion to suppress when the interrogating officers “raised the spectre of the electric chair,” in addition to employing a number of other coercive tactics, to elicit the defendant’s confession. See 386 So.2d at 235-36.[11] That case, however, is factually dissimilar from the situation Martin confronted.
In Brewer, the interrogating officers told the defendant that they knew he had committed second-degree murder and, therefore, he should confess to the crime to avoid a first-degree murder charge. Id. at 233. Evidence at the crime scene linking the defendant to the homicide had already been found. This evidence included the defendant’s cap, shoe-track impressions matching the defendant’s shoes, and blood matching the victim’s found on the defendant’s boots. Id. Aware of this evidence, police officers arrested the defendant, advised him of his Miranda rights, and interrogated him. Id. The defendant thereafter made incriminating statements during the interrogation. Before trial, the defendant moved to suppress his incriminating statements. Id. After reviewing the recorded interrogation, the trial court concluded that the defendant’s statements were coerced and excluded them. Id. at 236.
This Court concluded that the trial court properly excluded the incriminating statements made by the defendant during his interrogation because the interrogating officers pressured the defendant by stating that, given the already available and incriminating evidence, the defendant had only two options — either the electric chair or time in prison. Id. at 234-35. During the Brewer interrogation, the detectives said, in relevant part:
FIRST VOICE: If you get convicted of first degree murder, now it’s the damn electric chair or life. Now that’s the way — that’s what it amounts to. But, if you [] know, if you committed second degree murder, it’s what? Five? What? Twenty? Twenty years to life and you’re eligible for parole at five or seven, see? That’s second degree. That’s what you did. I know that’s what you did. That’s what you did. Second degree murder. But, if we put all this evidence we got before a jury, you are *300 liable to get convicted, of first degree murder. Look, we know you were ... in the area. We know you went to the restaurant. Your knife was found under that woman. Your knife, that’s been identified as your knife, it’s even got your name on it....
SECOND VOICE: Engraved on it.
[[Image here]]
FIRST VOICE: ... And I guarantee you when we go to court, if we go to a trial on this thing, buddy, they are going to find you guilty. I’ll swear they are. They will find you guilty and they will send you away for the rest of your life if they don’t put you in the electric chair. Where you go ahead and cooperate and tell us you’ve done this thing and tell us how you done it, tell us where that billfold is, tell us where the billfold is, we’ll help you out on this thing. We’ll get — you’ll get out of this thing on second degree murder. But we got you. We got you locked up in this thing. And that’s the truth ....
Id. at 233-35 (emphasis supplied).
Although Martin’s interview at times addressed the death penalty as a possible punishment, both the purpose of the interview and the context in which this topic was addressed contrast significantly from that which we held induced a coerced, and therefore inadmissible, confession in Brewer. The stated objective of the detectives interviewing Martin was to gain his trust to locate Jacey. At the time of the interview, all that law enforcement knew was that Martin likely had information regarding Jacey’s whereabouts because he was the last person known to have had contact with her.[12] Although law enforcement may have been concerned that foul play was involved — the detectives who interviewed Martin were from the Sheriffs departments’ homicide division and Jacey’s whereabouts had been unknown for nine days when Martin’s interview occurred— nothing else indicates that the detectives suspected Martin was the culprit behind her disappearance, at least when the interview session began. The dialogue between Martin and the detectives, combined with their lack of knowledge regarding Jacey’s welfare, do not transform otherwise unobjectionable statements regarding possible punishments into a constitutionally impermissible interrogation.
In Walker v. State, this Court upheld the trial court’s denial of the defendant’s motion to suppress. 707 So.2d 300 (Fla.1997). In Walker, detectives had questioned the defendant for six hours, provided drinks “upon request,” and allowed him to use the restroom. Id. at 311. The detectives had also reminded the defendant that the death penalty was a potential punishment for murder, but did not threaten the defendant with the electric chair or promise him anything other than informing the prosecutor that the defendant had cooperated. Id. The trial court described the tactics used by interrogating detectives as techniques that “everyone knows about” and “have not been disapproved by the law in any way.” Id. On direct appeal, this Court held that the interrogation “simply [could not] be characterized as so coercive as to render [the] confession involuntary.” Id.
Martin directs attention to the following exchange as an example of the detectives’ reliance on the death penalty as a possible punishment to coerce his confession:
WOLCOTT: ... Okay, we need your help. Okay. This is a very serious situation that we are all right here. Okay, probably one of the biggest days of your *301 life right now. Okay, you are not a bad person. Okay, you have had some minor shit. Man we have all had minor shit. I ain’t in here to judge you brother. But you are tired, I can tell you are tired. It’s been tough. Okay, I know I can see it in your eyes man. You are not a monster are you? Are you cold blooded?
MARTIN: No not at all.
WOLCOTT: You are a decent guy aren’t you?
MARTIN: I try.
WOLCOTT: You have just had some bad breaks. Right? Is that safe to say?
MARTIN: Yes sir.
WOLCOTT: You have had some bad breaks, okay. We need you to be honest with us and we need your help okay? Because I am telling you right now, [your girlfriend], as much as she loves you sitting over there, she ain’t, she is not going to back you up on something this big.
MARTIN: Oh, I know.
WOLCOTT: You know that right?
MARTIN: Unhuh.
WOLCOTT: And getting up in front of that jury of 12 people, we are going to parade a pretty little blond haired girl that ain’t never been in no trouble up there and s[i]t down and tell the story. Okay and then they are going to parade us and everyone we have talked to about everything else and then they are going to parade you up there. And like I said, I am not here to judge you. Okay, but let’s face it. Common sense tells you who are they probably going to believe? [Your girlfriend]?
MARTIN: Yea.
WOLCOTT: The girl that hasn’t ever been in trouble. Don’t do this. She is not going to protect you. You have you, okay. There is an out. I mean there is a light at the end of this tunnel. Things happen for a reason. Okay, he and I go out and if he and I go out to a bar one night and a fight happens, okay, I am going to defend myself man. I am not going to let someone hit me, but in the meantime while I am hitting him back, my intent might not be to hurt him bad.
MARTIN: Unhuh.
WOLCOTT: Or potentially even kill him. That might not be my intent. Things might have just went wrong.
MARTIN: Unhuh.
WOLCOTT: People can understand that. People can all relate to that. People have all been in that situation. The situation people can’t relate with is why something is done for no reason. Okay. You need to help yourself. You need to help her family. We need to get some answers, okay. It’s that simple. Okay there is a lot of stuff that’s mounting against you. You said so yourself, the picture doesn’t look that good.
MARTIN: Oh, I know.
WOLCOTT: Okay. The best thing that David can do for David is to help us find [Jaeey]. Okay.
MARTIN: Uhhuh.
WOLCOTT: Because you look like a monster if you don’t. You really do. And you know where monsters go. Monsters go to prison, monsters go to death row. Monsters never see the light of day again ....
MARTIN: Right.
WOLCOTT: You have had some bad breaks. Where do we need to go find her?
MARTIN: I have no idea. I mean I don’t know.
(Emphasis supplied.)
Similar to the Walker interview, the interview here did not occur in an *302 unduly oppressive environment. The interview lasted approximately three-and-a-half hours. It included a bathroom break and inquiries regarding Martin’s welfare. The detectives’ comments regarding the death penalty, and the realities of trial, were not made to incite fear in Martin, but were part of a larger conversation regarding possible penalties Martin could face in the absence of further explanation from him with regard to what happened the last time he and Jacey were together. See United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir.1992) (holding that a government officer “who informs the defendant of realistically expected penalties for cooperation and/or non-cooperation does not offer an illegal inducement”).
The detectives’ statements are best interpreted as representations to Martin that Jacey’s disappearance may have been the consequence of an accident rather than some preconceived, evil plan. Given that Martin’s account of the night he spent with Jacey evolved over the course of the interview, it is not surprising that the detectives continued to press Martin for an explanation while simultaneously addressing the implications of Martin providing false or deceptive testimony. Doing so, however, does not automatically transform into a conclusion that the detectives coerced Martin into confessing.
Martin also alleges that the detectives implied he would not receive a fair trial if he did not provide them with the information they sought and threatened him with their testimonial damnation. Martin cites the following exchange in support of his allegation that he would not receive a fair trial:
WOLCOTT: And getting up in front of that jury of 12 people, we are going to parade a pretty little blond haired girl that ain’t never been in no trouble up there and s[i]t down and tell the story. Okay and then they are going to parade us and everyone we have talked to about everything else and then they are going to parade you up there. And like I said, I am not here to judge you. Okay, but let's face it. Common sense tells you who are they probably going to believe? [Your girlfriend]?
(Emphasis supplied.)
Shortly thereafter, the following colloquy took place between Detective Wolcott and Martin. Martin alleges that this exchange also supports his allegation that the detectives threatened him with their testimonial damnation:
MARTIN: I didn’t do nothing to her. I did not lay a hair on her.
WOLCOTT: David.
MARTIN: Yes.
WOLCOTT: Why are you putting yourself in this position? Why?
MARTIN: In what position?
WOLCOTT: The one you are sitting in right now. You can’t tell me some of the truth, okay and then lead us to believe everything that’s being said. You just can’t.
MARTIN: You are right. I already tried that and it didn’t work.
WOLCOTT: You see.
MARTIN: You got stuff out of me. Huh?
WOLCOTT: Who do you think Ifsic] going to believe? You know whose those people are right?
MARTIN: Right.
WOLCOTT: That’s the jury.
MARTIN: Unhuh.
WOLCOTT: You go in there and tell them what you are telling me right now and they aren’t going to believe you.
MARTIN: I know. I already know. And. That’s why it is so, that’s why I am so worried about it.
*303 WOLCOTT: I know you are worried about it. It’s bothering you and we can see that.... We understand that you are scared okay.... Give me the opportunity to go do what’s right. You need to do what’s right David. Let me go do what’s right. I need to leave here now and go do what’s right.... Let me go tell those people that David did what was right. That David got into a situation that he couldn’t control. That David didn’t mean to do what happened. David told me where she was at. David told me he was sorry for what happened. He didn’t mean for this to happen. It wasn’t planned. It just happened. Let me go get her and take her home. Do what is right David.
MARTIN: You don’t understand.... David doesn’t know where she’s at.
WOLCOTT: David, you are the last one that was with her.
MARTIN: [TJhat’s the last place I seen the girl. Right there.
WOLCOTT: [T]hat girl would have walked up to that house, knocked on the front door and said call the police. She did not do that. She would have done that. It has been 9 days David. She didn’t do that. Okay. What are these people going to believe now when I walk in and say this is what we have[?]
MARTIN: Right.
WOLCOTT: I mean we already know what happened, but he is not remorseful for it. He doesn’t care because he won’t tell us anything. What do you think they are going to look at you as? They are going to look at you as the monster that you are not.
Later, Detective Wolcott made the following statements:
WOLCOTT: And it’s going to be dark soon. And we still want to call this mother back. You don’t know how bad both of us want to call this mother right now, back on the phone and tell her it’s over.... She’s not dumb. [Jacey] doesn’t miss work. Mom knows. She has told us she knows. She just wants her back so that she can do the right thing by her, which makes you the better person because you allowed her to do that. You are not going to be viewed upon as the monster. But once I leave you are the monster. And that’s what everybody is going to look at and I am not going to be able to say, yes, you know he helped me. I am going to say, no he didn’t. And you are going to be sitting there and you are going to hear me say it and I am not going to lie. And those other people are going to listen to it and you are going to be the monster, but I don’t think that’s really what happened. I mean I think she got hurt, I can understand. You didn’t go there to do that. All you wanted was a car. You wanted a car to get to your fiancé[e]. And unfortunately in the process of getting that car, it went bad. Something that at that point you couldn’t control. Which doesn’t put you at the top of the tree.[13] It puts you at the bottom like he was explaining to you. So you are going to have to make a decision. Are you going to be the monster or are you going to tell me how I can take her home?
[[Image here]]
So whether or not you want to trust me and I hope that you would.... I understand because of the job that I have. Whether or not you want to trust me, that’s fine. Okay, I am not the one *304 that makes the decision about what happens with the rest of your life. The guy in the robe up there is the one that’s going to make the decision about what happens the rest of your life. Okay, the attorney isn’t going to be the one. It’s going to be these people right here.... Okay, they are just folks. They have hearts. They make mistakes. Okay, forgiveness. Repenting. What they are not going to accept is being lied to. Just like you and me.
[[Image here]]
You’ve got everyday people, everyday people that are going to decide what happens from here on out and my partner and I are going to have to get up there and tell them. Okay, what are we going to have to tell them? We are going to have to say, you know what David, you did the right thing, you did the right thing folks. It’s a shame it happened, it was a mistake. But he did the right thing. And her mom is going to get up there and have an opportunity to speak to them ... I know her being a woman of religion, she’s going to have forgiveness.... Do you want these folks back here to hear out of us that David is cold-blooded and he meant this to happen? That this is how he wanted it to be, that he said you know what. I know her mom is upset but screw her. Give me what I get. You are definitely going to be in a bad position. There is no doubt about it.
(Emphasis supplied.)
In evaluating whether the techniques employed by law enforcement crossed the line into coercive conduct, we again turn to the interrogation in Brewer, in which this Court held that the defendant’s confession was inadmissible because the detectives engaged in “actual threats, promises of leniency, and [made] statements calculated to delude the appellant as to his true position.” 386 So.2d at 237.
FIRST VOICE: ... [H]ow is a jury going [to see this situation], you think of 12 people that don’t know a damn thing about the law sitting back there listening to this, see? They don’t know as much about the law as me or Aired or maybe not as much as you; but, they are sitting there listening. All right. Here — here he was. His knife was under the woman. We’ve got your boots that’s got blood all over them. All over them. Even where they were polished. We are going to present that to the jury. We are going to let them look at it.... SECOND VOICE: Yes, sir.
[[Image here]]
FIRST VOICE: You were wearing them that night, weren’t you?
SECOND VOICE: Yes, sir.
FIRST VOICE: And why did you lie to us and tell us that you had them others on? It ain’t going to do you any good to lie, Pat. If you done it, tell us, and tell us right now, and we’ll help you out on this thing. They are going to come to us and they are going to say, “Did you cooperate?” We are going to say, “yes, he did. He’s sorry for what he done. We believe he can be rehabilitated.” That’s what we will tell the parole people when the (sic) come to us. If you hang back and try to lie to us, we are going to say, “yes, he lied to us. He hasn’t admitted it. We had to go to a jury trial. The jury found him guilty. They sent him away for life.” And that’s the way it will be. You will be there the rest of your damn life. Hell, tell us about it. We put a guy in jail, just like you, just about the same age, for the same thing not one month ago. Now, he was on drugs too. Hell, you’re sorry for what you’ve done. I know you are. Tell us about it. Get it off your con *305 science. We’ll help you out. I’m serious. Won’t we, Aired? I tell you, a damn jury is going to convict you, Pat. We got all kinds of evidence on you. Even if what you told us is true, a jury will still convict you of first degree murder. You’ve got 12 people sitting back there and they’ve read about all this stuff in the papers and, man, these people will just string you by the nape of your neck right now if they get their hands on you. Hell, we know you done it. You know you done it. We can prove it in court. Admit it. Say you’re sorry. Try and get off light. That’s your only recourse.
Brewer, 386 So.2d at 234-35 (emphasis supplied).
To advise a suspect of potential penalties and consequences does not amount to a threat. See Mendoza-Cecelia, 963 F.2d at 1475. In a similar manner, encouraging a suspect to cooperate with law enforcement is not coercive conduct. See Fitzpatrick v. State, 900 So.2d 495, 512 (Fla.2005) (holding that parole officer’s advisement to defendant to cooperate did not vitiate the voluntariness of his statements). It is recognized that advising a suspect that he should expect a conviction of murder because a jury will not believe him despite the evidence presented is a threatening and coercive tactic that is totally improper under our Fifth Amendment jurisprudence. This is the kind of dialogue the defendant in Brewer confronted and is unlike that which Martin faced during his interview. We conclude that the statements the detectives made during Martin’s interview did not place the type of pressure upon Martin that would be deemed coercive and render his confession inadmissible.
In Martin’s case, when the detectives’ statements are evaluated in context, they reveal that the detectives thought that the jury would not believe Martin’s story about what had occurred the last time he was with Jacey. Detective Wolcott’s statements indicate that he believed Martin could be charged with premeditated murder if he did not provide a reasonable explanation as to what had transpired between Martin and Jacey on the day he stole her ear. The Brewer officers, in contrast, told the suspect that if he did not confess to the crime, he would not receive a fair trial because a jury would find him guilty no matter the evidence presented, or what he claimed had occurred. 386 So.2d at 235.
Moreover, to conclude that the statements the interviewing detectives made induced a coerced confession would seriously undercut law enforcement’s ability to elicit admissions in the pursuit of the public welfare, to assist victims of crimes, and to investigate disappearances. Certainly, to some extent, “any custodial interrogation involves some informal compulsion,” but that is why Miranda warnings, which undeniably were given in this case, are a nonnegotiable element of a voluntary confession during custodial interrogation. See Bowen v. State, 565 So.2d 384, 387 (Fla. 5th DCA 1990). Given the totality of the circumstances — the detectives’ lack of knowledge regarding Martin’s role in Ja-cey’s disappearance, the nature of the statements made regarding the death penalty, and the physical environment in which the interview was conducted — we conclude that the detectives’ comments at issue did not incite fear in Martin to the extent that his resulting confession was a product of improper police coercion.
Delusion
Martin next alleges that the detectives coerced his confession by making him believe that the situation he faced was not very serious while also implying that he would not receive a fair trial unless he *306 confessed to the crime. Martin contends that the detectives’ statements to this effect deluded him as to his true position, and thus procured his involuntary, and therefore invalid, confession. Martin points to his first exchange with the detectives that we addressed when we discussed the detectives’ comments regarding the death penalty in addition to other exchanges.
Throughout the interview, the detectives pressed Martin on the importance of providing them with any information that he might have with regard to Jacey’s welfare and location:
WOLCOTT: ... I see it on you and the moment I walked in you know brother you, you are a good kid. You have a long life to go. You got some minor little shit to take care of but you know what? That’s stuff that can be taken care of. There can be a future for David. There can, okay. All these lies of all this evidence are not fitting together is not going to help David. Okay, that is going to put David where David doesn’t want to be. Okay. All we want are some answers for her family. Out of respect for them. Out of respect for her mama. It’s that simple. I mean it’s not that hard man. Don’t make your life be over because of something so simple as just us giving her mom some closure. Don’t mask it man. You got any brothers or sisters or anything? ...
Stop giving yourself pain. Let it off your chest. Let [us] give some answers. Let’s let David put this behind him so that he can move forward in life. You can’t run all your life looking over your shoulder. Something like this will never, ever, ever go away. Ever. Whether it’s up here or whether it’s because we are out here. Okay, the easiest way for David to let this go away and to start washing your hands and start looking forward to your future. Just by giving some answers, that’s it. Okay. I am not saying I want you to do, the last thing I want you to do is lie to me. Okay.
[[Image here]]
Don’t you want what’s best for her? MARTIN: I do.
WOLCOTT: And what’s best for her family?
MARTIN: Yea.
[[Image here]]
WOLCOTT: You wouldn’t want your mom to hurt like that.
MARTIN: I wouldn’t want to [inaudible].
WOLCOTT: Don’t you, correct. So for her mom man. Tell us where we can go get her so we can end this?
MARTIN: I don’t know where she is man. I didn’t do nothing to her.
At this point in the interview, Martin’s story began to shift. Martin stated that Jacey had not loaned him her car; rather, he had stolen it from her. Martin explained that Jacey was crying and yelling when he stole it and left her behind in Middleburg. The detectives, in response, made the following statements regarding Jacey’s cell phone records:
WOLCOTT: We are starting to believe you more now. Okay, because what you are saying is lining up with some of the stuff that we have done in the works, okay.
MARTIN: We went to more than just Black Creek.
WOLCOTT: Okay.... Hold on a second. Let’s get back over here, okay. We have a problem now. Okay. Don’t let everything we have talked about in this room get thrown out the window because of leaving out a part of it. Okay, I know it’s hard. I know it. David is not a bad guy. David is not *307 cold-hearted. David is not a monster, okay. She just didn’t get out of the car.
MARTIN: She did, she got out of the car.
WOLCOTT: David, I can tell you right now, we have worked with 100⅛ of people. All we[’ve] been doing is working on this. Okay, we know everywhere you have been by your phone. By Jacey’s phone. By [your girfriend’s] phone. Don’t let the little element of what happened ruin the rest of your life. Okay. You didn’t want your fiancé[e] to hurt, you had to get down here, I understand that. People can understand that. People have been hurt inside over love, okay. People have been hurt on the side of love. She just didn’t get out of the car David. Please for her mom man, if anything for her mom, okay. Let’s not do this. Okay.
Martin proceeded to protest any involvement in Jacey’s disappearance apart from leaving her behind in Middleburg. The detectives, in turn, continued to press Martin to provide information as to Jacey’s whereabouts and as to what had transpired during their last encounter.
WOLCOTT: Tell me where I can go to get her. Do the right thing. It is very simple. I think what happened here was an accident David. You wanted a car and you wanted to come down here. And I think that from there, everything else, it wasn’t planned. It was an accident son.
MARTIN: Let me tell you what, even if I could tell you where she’s at. The whole point about it’s an accident, people don’t give a fuck about that. It’s an accident, it’s whether or not, whether or not, I mean I don’t know what I am trying to say.
WOLCOTT: David, people do care. There is many a times that I have had cases where it was justified, excusable, there was not intent. Stuff like that, okay and it just disappeared. But you know what happened in all those cases. Everybody stepped up and told the truth. None of that can happen.
WEST: Not one, you have zero shot, okay, by not telling the truth....
Martin further contends that the exchanges in which the detectives addressed possible penalties also contributed to his involuntary confession. He alleges that aspects of the dialogue prove that the detectives were engaged in a calculated effort to delude him into confessing by telling him that he would have a future if he apologized for his “mistake.” The exchanges, however, when evaluated in their entirety, indicate that the detectives believed that Martin likely had not committed premeditated murder, but instead had fatally harmed Jacey by accident. These exchanges evince that the detectives’ efforts were focused on gathering as much information as possible in their attempt to locate Jacey.
WOLCOTT: I know you are trying to do the right thing and I think that you are. Okay, to an extent. I know now that you are standing on a cliff. Okay, you keep looking back and it sure looks good to go that way, but you are teetering this way and a long way down. Okay there is a safety net. There is a huge difference from David facing premeditated planned first degree monster cold blooded murder, okay. To the other end of, it wasn’t planned. It wasn’t supposed to go like that. That’s not my intent. A lot was going on. I am busting loose at the se[a]ms. I know that in my heart I need to get to this area. I am sorry, please. There’s different levels. People care. She cared okay. [Jáeey’s mother] didn’t ask me what’s going to happen to David because I want to see that he goes to prison. She was like I *308 want my daughter. I need my daughter. Please, I don’t know how [much] more I can beg you. Just give her the [inaudible] okay? That’s all I ask you, okay. My partner and I have not lied to you. Everything we told you is the truth. David is not a pre-meditated murderer. Okay, those people deserve to go to the electric chair. Okay, but there’s several things below it. Okay, you may be way down here brother. I don’t know, you may be up in here. I don’t know unless you tell me. I need to, you got to tell me. Okay, there is a reason why everything happens. Was it a moment of rage, what is it? I mean there is a reason. Are you this guy? [14] Are you the guy up here? Are you the guy at the top of the tree?
MARTIN: No.
WOLCOTT: Are you the guy that wrote notes and planned for this to happen?
MARTIN: Nope.
WOLCOTT: Okay.
MARTIN: And I am not the guy down at the bottom either. I am no where in here. I don’t know what else to say. I really don’t. I mean I know what you are asking of me, but I don’t know. It’s something I can’t answer. I just can’t.
[[Image here]]
MARTIN: I told you where I left her at. I didn’t leave her in no harmful situation. Perfectly healthy. Standing on her own two feet.
[[Image here]]
WOLCOTT: Okay. She was saying don’t take my car?
MARTIN: She said a lot of shit.
WOLCOTT: Unhuh. But what she said was, what she was saying to you is you don’t have to do this, but in a rage that you were in that’s what you did.
MARTIN: Unhuh.
WOLCOTT: And that’s understandable. Like you said you are not at the top of the tree, you are at the bottom of the tree, okay. That’s what people are going to view. You are not the monster. But you have got to help yourself now....
When evaluated in the context of the entire investigatory session, exchanges such as the foregoing do not illustrate that the detectives explicitly told Martin that he would not receive the death penalty, that they knew that he did not commit first-degree murder, that they could promise him any specific result if he confessed, or that he was not facing a serious situation. The fact that some of the detectives’ statements may have led Martin to believe that he would never face a premeditated murder charge does not transform the detectives’ words into misrepresentative and coercive statements. These exchanges indicate that the detectives were, first and foremost, trying to locate Jacey. This goal oriented the interview. Their repeated emphasis on bringing closure to Jaceys mother by bringing Jacey home to her family supports our conclusion that this was their primary objective in interviewing Martin, and that their statements were not intended to foster disillusion.
The detectives did not tell Martin that they knew what charges he would face. Their address of first-degree murder charges and a homicide-tree diagram demonstrate that the detectives intended to clarify to Martin that he would not face premeditated murder charges if, as the detectives believed at that time, he had not intended to hurt Jacey. Indeed, Detective *309 Wolcott stated that he would not know where Martin fell on the diagram until Martin told him and Detective West the full story. The detectives’ discussion of the various charges on the diagram highlights that they were not focused on only a first-degree murder charge, but were discussing a range of possible penalties.
Additionally, the detectives made it clear to Martin that he was facing a serious situation — one that they could help him with only up to a point. Later on in the interview, Detective Wolcott stated to Martin that “today is the biggest day of your life,” and clearly articulated the limits of their authority to Martin. Martin cites to the following exchange:
WOLCOTT: Does the boy that stole the candy bar because he wanted it so bad and came back and said he was sorry. Does he deserve that?
MARTIN: Nope.
WOLCOTT: David doesn’t deserve that. There is only one way David and that’s here’s your leash. I am so sorry. I am sorry I had to take your time out of your day and I shouldn’t have done it. I am sorry. Okay. Can we get past all that other stuff and just get to I’m sorry[?] Okay, I made a mistake. People make um. All right? Please, that’s all we are asking. That’s all she’s asking. She deserves better than this. You deserve better than this. Your future with [your girlfriend] deserve[s] better than this, okay.
MARTIN: What future? You know whether I did anything or not I am still gonna fucking get life in prison you know? Whether I did anything or not.
WOLCOTT: Not at all.
MARTIN: Oh, yea.
WOLCOTT: Not at all.
WEST: Remember what we told you in the beginning? You weren’t after Jacey. You were after the car.
MARTIN: You are right.
WEST: And that’s what I tried to explain to you earlier. Accident[s] happen. You weren’t after Jacey, you were after the vehicle.
MARTIN: Which I got.
WEST: Which you got.
MARTIN: Remember how you said—
WEST: Accidental happen. People understand accidents. They don’t understand monsters. Remember how you said you watched CSI and you liked that show. They are based on kind of true stories.
[[Image here]]
The detectives did not indicate that they could promise any specific result. Their statements, evaluated in context, do not indicate that they promised Martin that he would not be charged with premeditated murder. The statements indicate that they did not believe he was guilty of first-degree murder, and the only way they could confirm those beliefs was if Martin explained what had transpired between he and Jacey the last time they were together.
This Court must “make every effort to eliminate the distorting effects of hindsight” by evaluating law enforcement’s performance from their perspective at the relevant time. See Jones v. State, 928 So.2d 1178, 1186 (Fla.2006) (quoting Blanco v. Wainwright, 507 So.2d 1377, 1381 (Fla.1987)). Our concern -with hindsight bias usually is addressed in the context of ineffective assistance of counsel claims, see, e.g., id. at 1186 (addressing the distorting effects of hindsight and ineffective assistance of counsel claims); Davis v. State, 928 So.2d 1089, 1105 (Fla.2005) (noting the same dilemmas as identified in *310 Jones), or Fourth Amendment claims as proscribed by the U.S. Supreme Court, see United States v. Martinez-Fuerte, 428 U.S. 543, 565, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (noting that one of the purposes behind requiring a search warrant is to “prevent hindsight from coloring the evaluation of the reasonableness, of a search or seizure”). The prospect of possible hindsight bias can also infiltrate an analysis of custodial interrogations as well. Here, Martin’s interviewing officers were charged with locating Jacey. They did not know whether Jacey was alive or dead. When the interview began, they did not have a reason to suspect that Martin had murdered Jacey. Their statements evinced uncertainty combined with growing suspicion in light of Martin’s changing story and incriminating statements over the course of an approximately three-and-a-half-hour interview. Rather than constituting misrepresentation, the detectives’ statements highlight an effort to locate a missing woman while informing Martin of the charges he could face if he was involved in Jacey’s disappearance.
The fact that select statements from law enforcement officers may later be taken out of context and construed as misrepre-sentative, while relevant, is but one factor in a larger, totality of the circumstances evaluation of the interview. See Frazier, 394 U.S. at 739, 89 S.Ct. 1420 (rejecting petitioner’s claim that his confession was involuntary because police misrepresented statements to him given a totality of the circumstances assessment). The statements here are insufficient to render what was ultimately a voluntary confession inadmissible.
To the extent that the detectives’ statements may have misled Martin and contributed to delusive thoughts, we note that law enforcement ought to make clear to suspects charged with criminal activity that they could face a variety of charges and penalties, depending on their degree of involvement, as occurred here. In the instant case, given these very specific factual circumstances, we hold that the detectives’ statements did not result in an involuntary confession from Martin.
Deception
Martin argues that the detectives impressed upon Martin the importance of confessing during the interview, rather than at a later time. Martin contends that the detectives coerced him into confessing because they suggested that if he did not confess at that time, then he could not reap the benefits of cooperation. Martin notes that during the interrogation Detective Wolcott stated:
WOLCOTT: Like you said you are not at the top of the tree, you are at the bottom of the tree, okay. That’s what people are going to view. You are not the monster. But you have got to help yourself now, because we are going to leave and it ain’t like I can talk to you again tomorrow. And this is it. It’s getting late. Now it’s almost 3:30.
MARTIN: Yea I know.
WOLCOTT: And it’s going to be dark soon. And we still want to call [Jacey’s] mother back. You don’t know how bad both of us want to call this mother right now, back on the phone and tell her it’s over. That’s the most important thing for us is to say we’ve got her. Mama knows what the outcome is.
(Emphasis supplied.)
We do not agree with Martin’s interpretation of these statements. Detective Wolcott informed Martin that neither he nor Detective West would be available to speak with Martin after their current interview session. Detectives Wolcott and West were from counties other than that in which they conducted Martin’s inter *311 view. Detective Wolcott was from the Jacksonville Sheriffs Office located in Du-val County and Detective West was from the Clay County Sheriffs Office. Martin’s interview was conducted in Pinellas County. The detectives may have been required to return to their home counties the next day, and thus spoke truthfully of their inability to continue the interview thereafter.
Second, statements of the officers may be fairly interpreted as conveying that they themselves would return to their home counties and not be available to speak with Martin the following day. We do not agree that Detective Wolcott’s comment suggested that Martin would be categorically barred from speaking with other members of law enforcement at a later time, and thus pressured him into confessing at that moment.
Moreover, when these statements are evaluated in context, they do not indicate that the detectives informed Martin that this would be his only and last opportunity to speak with law enforcement and derive any prospective benefits from doing so. Rather, this exchange, like the other statement Martin attacks,[15] indicates that the detectives were telling Martin that he should help them find Jacey before they left Pinellas County because they would be engaged in the investigation in their home counties.
Martin relies on Ramirez v. State, in which the First District held the defendant’s confession to be involuntary where law enforcement said, among other comments, “[t]his is your only chance.” 15 So.3d 852, 854 (Fla. 1st DCA 2009). Ramirez, however, is clearly distinguishable. First, the detectives who interviewed Martin never stated that this would be Martin’s only opportunity to speak with law enforcement. Instead, Detectives Wol-cott’s and West’s comments suggested only that they would be returning to their home counties and would be working on other matters. Second, in Ramirez, the First District noted that the statement at issue was made during an interrogation replete with constitutional infringements. 15 So.3d at 856-57. For example, the Ramirez defendant “had already protested several times that he was being forced or obligated to answer the detective’s questions” and the interrogating detective alluded to helping the defendant but never explained the limits of his authority despite repeated requests by the defendant for information. Id. at 854.[16]
Martin’s interrogation, in contrast to that which took place in Ramirez, was oriented toward locating Jacey. The detectives focused on gaining Martin’s trust to further their search efforts. The detectives’ comments about their inability to speak with Martin tomorrow were not so misleading that they impacted the volun-tariness of Martin’s confession. Based on the totality of the circumstances surrounding the interrogation, we conclude that the comments Martin identifies did not overpower his will such that his confession was coerced.
Law Enforcement’s Influence
Martin next asserts that his confession is inadmissible because the *312 detectives promised to help him if he cooperated. It is clear in the record that Detectives Wolcott and West both explicitly told Martin that they could not make any promises, and we reject Martin’s claim. Although one may infer from- the discussion that the detectives may have some influence with those who would become involved in Martin’s case, their comments, when assessed in context, coupled with their explicit statements that they could not promise Martin anything, do not rise to the level of coercive conduct that violates his Fifth Amendment rights.
First, it must be noted that this Court has not held that a confession is rendered involuntary simply because the police promise to convey to the State that a suspect was cooperative. In Caraballo v. State, this Court rejected the defendant’s claim that his confession was rendered involuntary because interviewing officers prodded him to “ ‘tell the truth’ and promised to help him in court if he provided useful information.” 39 So.3d 1234, 1247 (Fla.2010). Similarly, in Maqueira v. State, this Court held that the voluntariness of the defendant’s confession was not vitiated because the interviewing officer agreed to make the defendant’s cooperation known to prosecuting authorities and to the court. 588 So.2d 221, 223 (Fla.1991). Likewise, in Bush v. State, this Court reiterated our holding in Paramore v. State that “a confession is not rendered inadmissible because the police tell the accused that it would be easier on him if he told the truth.” 461 So.2d 936, 939 (Fla.1984) (citing Paramore v. State, 229 So.2d 855, 858 (Fla.1969) judgment vacated in part by Paramore v. Florida, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972)).
Second, the detectives clarified the limits of their authority to Martin, and any representations of assistance were adequately addressed and refuted. The facts involved in those cases in which courts suppressed a suspect’s confession were far more extreme than those in this case.
Although not controlling, in Day, the court reversed a denial of a motion to suppress a confession in part because the investigator had made the limits of his authority in the process unclear, which added the “unrealistic hope” that the defendant would receive the investigator’s help. See 29 So.3d 1178, 1182 (Fla. 4th DCA 2010). It was this lack of explanation, coupled with comments implying that the interrogating detective had “significant authority” in the judicial process, which led the Day court to conclude that the confession was induced by improper police conduct. Id. at 1181.
Similarly, in Ramirez, the First District reversed partly because the trial court had improperly admitted the defendant’s interrogation, “at least after the point when the detective began to offer ‘help.’ ” See 15 So.3d at 857. However, that interview, as already noted, involved a litany of infringements upon the rights guaranteed to a suspect in custody. Id. at 854 (noting that at the point in which the officer began to offer “help,” the suspect had “already protested several times that he was being forced or obligated to answer the detective’s questions”).
Here, detectives clearly stated — immediately prior to Martin’s confession — that they could not make Martin any promises. In so doing, the interviewing detectives clearly explained to Martin the limits of their authority and did not commit an error similar to that in Day or Ramirez. See Ramirez, 15 So.3d at 856 (“The detective’s failure to explain the limits of his authority is one major factor that sets this case apart from other cases upholding offi *313 cers’ suggestions that they could help defendants.”).
Furthermore, when assessing whether a confession was involuntary, the Court must evaluate whether the interviewing detectives overbore the defendant’s will. See Blake, 972 So.2d at 844. This Court must balance any alleged infractions in context and against the noted objective of any interrogation — to gain as much information about the alleged crime without violating the suspect’s constitutional rights. See Stevens v. State, 419 So.2d 1058, 1063 (Fla.1982). This Court has never held that a confession is rendered involuntary simply because law enforcement promises to convey the suspect’s cooperation to prosecuting authorities. Here, because the detectives told Martin that they could not make him any promises, we are not persuaded that Martin’s confession was obtained against his will.
Promises to Arrange Visits
Martin also asserts that the detectives coerced his confession by making an explicit “quid pro quo” bargain with him. He asserts that the detectives violated his Fifth Amendment rights by promising him psychiatric help and a visit with his girlfriend in exchange for his cooperation. Many of the statements upon which Martin relies have already been addressed in our analysis rejecting previous claims. We incorporate those reasons for rejection here in our denial of this claim. We also reject Martin’s claim that the detectives’ statements concerning a visit from his girlfriend if he provided favorable information were coercive.
Martin relies on the following colloquy to support this claim:
MARTIN: Can yall arrange for me a phone call?
WOLCOTT: Phone call to where?
MARTIN: [My girlfriend.] I need two minutes.
WOLCOTT: I can’t, well I tell you what I will do to be fair okay. With them, but I am not going to tell you I am going to give you a phone call so that you stand here and trust me. Okay, but I do, I will make sure that, I believe she is trying to also get a visit.
MARTIN: Are they going to let her have one?
WOLCOTT: Oh, yea.
WEST: Yea, we can see it. We can make arrangements for visits okay, but we got this issue right now David that we have to cover first. Okay.
WOLCOTT: Just tell me where I can go get [Jacey].
MARTIN: Yall know where Johns Cemetery is right?
(Emphasis supplied.)
We find that the detectives’ statements with regard to arranging a visit between Martin and his girlfriend are not misleading. Within this brief exchange and others, the detectives clearly conveyed to Martin that they could not make him any promises, which included arranging a phone call for him to his girlfriend. Detective Wolcott noted that he only “believed” Martin’s girlfriend was trying to arrange a visit. Detective West stated that they could “make arrangements for visits” between Martin and his girlfriend.
Martin claims that this promise induced his confession in violation of U.S. Supreme Court precedent holding that a confession “must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.” Bram v. U.S., 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed. 568 (1897). This standard, however, is not the absolute yardstick in assessing the voluntariness of *314 a confession. See Arizona v. Fulminante, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (holding that this standard from Bram “does not state the standard for determining the voluntariness of a confession” under current precedent). The correct test is whether, based on a totality of the circumstances, Martin’s confession was voluntary. See Anderson v. State, 863 So.2d 169, 183 (Fla.2003); Blake, 972 So.2d at 843-44; Brewer, 386 So.2d at 237.
Although this Court has stated that the presence of an express quid pro quo bargain for a confession will render it coerced, see Ramirez, 15 So.3d at 856, it is improper to transform this statement into a rule that any alleged exchange automatically vitiates the voluntariness of a confession. The issue with express quid pro quo bargains was addressed in Florida by the Second District Court of Appeal, in which that court held that “statements suggesting leniency are only objectionable if they establish” such a bargain. See State v. Moore, 530 So.2d 349, 350 (Fla. 2d DCA 1988). The more recent decisions of the U.S. Supreme Count render this authority questionable at best. Today, with regard to Martin’s interview, we evaluate the detectives’ statements, particularly those of Detective Wolcott, in light of the totality of the circumstances.
The Bram standard is clearly no longer the limited standard to be applied. Law enforcement, nevertheless, should not be making any promises — explicit or implied — to a suspect in custody. It is an inviolate principle of law that an admissible confession is one that is free and voluntary. See Anderson, 863 So.2d at 183 (citing Brewer, 386 So.2d at 235). In the case at bar, it is argued that Detective Wolcott’s comment should be interpreted as leading Martin to believe that if he provided a confession he could expect a meeting with his girlfriend. If this was the design, the design was improper.
Here, however, we do not agree with Martin that Detective Wolcott’s statement ultimately coerced his. confession. Detective Wolcott’s statement was isolated and couched between other statements rejecting the notion that the detectives could make any promises to Martin. The detectives conveyed to Martin that anything he sought from them could only be addressed after the matter of locating Jacey was resolved. Moreover, the detectives did not threaten Martin nor was the interview conducted in an unduly oppressive manner. A totality of the circumstances assessment supports our conclusion that this claimed error did not result in an involuntary confession. Consequently, we do not agree that Detective Wolcott’s alleged promise of a meeting between Martin and his girlfriend made it impossible for Martin to make a rational choice with regard to whether he should implicate himself in Ja-cey’s disappearance.
Exploitation of Religious Beliefs
Finally, Martin claims that the detectives coerced his confession because they relied on a variation of the “Christian burial technique,” which this Court has previously characterized as a “coercive and deceptive ploy.” Roman v. State, 475 So.2d 1228, 1232 (Fla.1985). Martin states that the detectives encouraged him to confess so they could bring Jacey back to her mother. The detectives stated that the Bible teaches forgiveness and that whether or not “god is number one in your book, it is for people like [Jacey’s mother].”
However, this exchange, as with the others previously addressed, did not render Martin’s confession involuntary. Despite this Court’s denunciation of the Christian burial technique in Roman, this Court did not suppress the confession in that case. *315 In fact, the Roman Court upheld the admission of the defendant’s confession because it found that the use of the Christian burial tactic did “not directly result” in the defendant’s confession. 475 So.2d at 1232; Hudson v. State, 538 So.2d 829, 830 (Fla.1989) (holding confession admissible despite officer’s plea to defendant to help law enforcement locate the body so that the family would be able to lay the deceased to rest). The Roman Court explained that the use of the tactic was “a factor among the totality of circumstances” that the Court evaluated, and in that case, it “was insufficient to make an otherwise voluntary statement inadmissible.” 475 So.2d at 1232-33.
The detectives’ references to bringing Jacey back to her family were accompanied by statements regarding the welfare of Jacey’s mother at a time when Jacey was considered only missing. Although the detectives may have exaggerated the truth with regard to the mother’s level of distress, their characterizations, when taken in context, do not appear to have overbore Martin’s free will such that he was unable to make a rationale choice with regard to confessing.
Misrepresentations by an interrogator to a suspect which may be relevant to the crime under investigation do not require a suppression of the confession. See Bowen, 565 So.2d at 387. Here, the detectives may have exaggerated how Ja-cey’s mother was feeling at that time because it is unclear whether they had been in contact with her. Their assumptions as to the condition of Jacey’s mother do not seem completely out of line. At the time of the interrogation, Jacey’s mother knew that her daughter had been missing for nine days, which was out of character for Jacey. Jacey’s mother, who was the first person to alert the police that Jacey was missing, likely was extremely distraught, and the detectives’ comments regarding her mental state probably were not misrepresentations at all.
Under the totality of the circumstances, we conclude that the detectives’ statements that Martin should assist in their efforts to provide Jacey’s family with information as to how to find her were not coercive. However, well-trained investigators need to be cautioned to avoid violating the prohibition against playing upon religious sympathies when interviewing a suspect.

Fifth Amendment Challenge—Totality of the Circumstances

Whether Martin’s confession was coerced and is therefore inadmissible must be decided by viewing the totality of the circumstances. See Frazier, 394 U.S. at 739, 89 S.Ct. 1420; Blake, 972 So.2d at 843-44. A trial court’s ruling on a motion to suppress is accorded great deference. See Walker, 707 So.2d at 311. On the facts of this case, we find no error in the trial court’s decision to admit Martin’s confession. The interview was of relatively short duration; the detectives read Martin his Miranda rights at the beginning of the interview; and at no point did Martin invoke his right to remain silent. His ambiguous statement—“I have nothing really to talk about”—supports our conclusion that the detectives did not have an obligation to clarify his statement or stop the interview.
The interviewing detectives engaged in a variety of tactics to elicit information from Martin. Given the specific factual circumstances addressed in this case, however, we do not agree with Martin’s contention that the interviewing detectives coerced his confession, thus rendering it inadmissible. Law enforcement must be afforded some leeway in how they conduct interrogations to ensure public safety and to fur *316 ther their objective of locating a missing person who might still be alive. The interview here cannot be characterized as so coercive as to render Martin’s confession involuntary. Although some of the tactics and techniques used by the detectives may have been less than ideal, West and Wol-cott did not directly threaten, deceive, or delude Martin into confessing. Therefore, we affirm the trial court’s denial of Martin’s motion to suppress.
Cold, Calculated, and Premeditated (CCP)
Martin next asserts that the trial court erred in finding the aggravating factor of cold, calculated, and premeditated to be established in his capital murder prosecution. To establish CCP, the State must show
that the killing was the product of cool and calm reflection and was not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Connor v. State, 803 So.2d 598, 610 (Fla.2001); see Ballard v. State, 66 So.3d 912, 918-19 (Fla.2011). “The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant.” Ballard, 66 So.3d at 919 (quoting Wright v. State, 19 So.3d 277, 298 (Fla.2009)).
While “heightened premeditation” may be inferred from the circumstances of the killing, it also requires proof beyond a reasonable doubt of “premeditation over and above what is required for unaggravated first-degree murder.” The “plan to kill cannot be inferred solely from a plan to commit, or the commission of, another felony.”
Brown v. State, 721 So.2d 274, 279 (Fla.1998) (citations omitted). CCP is determined based upon an assessment of the “totality of the circumstances.” See Ballard, 66 So.3d at 919.
In the sentencing order, the trial court stated the following with regard to this aggravator:
Evidence presented at trial showed that in the days leading up to the murder, the Defendant had a phone conversation with [his girlfriend], where she asked him how could he come visit her in St. Petersburg since he did not own a car. The Defendant responded by saying he could just steal a car and kill the person he stole it from. Days later, the Defendant spent the evening with [Ja-cey] McWilliams, telling her it would be a “special night.” While together, he drove her to an isolated location in Mid-dleburg where the murder could not be observed. The Defendant then retrieved a hammer from the vehicle, while [Jacey] McWilliams looked away and smoked a cigarette, the Defendant struck her with the hammer, using great force. The evidence established the Defendant himself brought the hammer that evening, and that the Defendant later told the police the first blow was from behind. [The Defendant’s girlfriend] received a phone call from the Defendant moments after the murder in which she described his demeanor as giddy, and that he showed no signs of emotional distress or panic.
Martin contends that because the evidence here is consistent with a reasonable hypothesis that Jacey’s murder was the result of an unplanned, spur of the moment act, and that only circumstantial evidence supports the court’s finding, the trial court’s finding of CCP cannot be sustained. This argument is without merit.
*317 First, CCP can be proven by circumstantial evidence. See Pearce v. State, 880 So.2d 561, 572 (Fla.2004). Circumstantial evidence of premeditation may be shown by evaluating “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id.
The record reveals legally sufficient evidence from which the jury could have concluded that Martin had a prearranged plan to kill Jacey and exhibited heightened premeditation. Martin’s girlfriend testified that she and Martin had talked about stealing a car, killing the owner, and hiding the body in a cemetery. During trial, Martin confirmed that a conversation about stealing a car occurred, though he said that they did not discuss killing anyone. E.g., Brown, 721 So.2d at 280 (noting that the defendant told law enforcement that his accomplice had suggested that “they find a car and kill the person who owned it” to support the Court’s conclusion that the defendant carried out a “carefully thought-out and pre-designed plan”). During trial, evidence also revealed that Martin enticed Jacey to go with him to a remote location through text messages and phone conversations that took place throughout the day of the murder. After killing Jacey, Martin left her body in a remote location in Middle-burg, which was consistent with his prior conversation with his girlfriend. In addition, the record reflected that Martin had a toolbox in the vehicle and had access to tools and a hammer that night. A hammer was used to kill Jacey.
The record also reveals evidence indicating that Jacey’s murder was the product of cool and calm reflection. Martin confessed to detectives that right before he killed Jacey he told her that he was returning to the car for another cigarette. Martin, however, returned to the car to retrieve a hammer, indicating that he had resolved himself to kill his friend and steal her car to visit his girlfriend. Thus, the circumstantial evidence presented at trial supports the trial court’s finding that this murder was committed in a cold, calculated, and premeditated manner.
Second, “the circumstantial evidence rule does not require the jury to believe the defendant’s version of the facts when the State has produced conflicting evidence.” Pearce, 880 So.2d at 572 (citing Spencer v. State, 645 So.2d 377, 381 (Fla.1994)). Rather, the rule requires the State to “ ‘introduce competent evidence which is inconsistent with the defendant’s theory of events’ to establish its case.” Reynolds v. State, 934 So.2d 1128, 1147 (Fla.2006) (quoting Darling v. State, 808 So.2d 145, 156 (Fla.2002)). The State presented competent evidence that Martin had discussed with his girlfriend that he would steal a car, murder its owner, and hide the body. Martin’s confession to police also supported the State’s theory of the case, which was inconsistent with Martin’s testimony at trial that another person killed Jacey. Thus, this aggravating circumstance was supported by competent, substantial evidence, and the trial court applied the correct rule of law. Accordingly, we affirm the trial court’s finding of CCP.
Mitigating Evidence
In his next challenge, Martin contends that the trial court erred in finding that he did not prove the mitigating factors of emotional abuse, sexual abuse, and remorse. The State responds that this specific claim was not preserved for appeal. We disagree. To preserve a claim, a party must present it “to the lower court *318 and the specific legal argument or ground to be argued on appeal must be part of that presentation.” Tillman v. State, 471 So.2d 32, 35 (Fla.1985). This issue was preserved by the presentation of evidence of abuse during the penalty phase of the trial and submission of forensic psychologist Dr. Krop’s deposition to the trial court at the conclusion of the Spencer hearing.
Moreover, even if this challenge was not preserved, this argument, nevertheless, is without merit. First, whether a circumstance has been proven is subject to the competent, substantial evidence standard of review. See Ault v. State, 53 So.3d 175, 189 (Fla.2010) (“A trial court may properly reject a proposed mitigating circumstance where there is competent, substantial evidence in the record to support its rejection.”), cert. denied, - U.S -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011). As discussed below, evidence presented at trial supports the trial court’s finding.
Second, this Court has acknowledged that there are situations in which “a mitigating circumstance may be found to be supported by the record, but given no weight.” Cox v. State, 819 So.2d 705, 722 (Fla.2002) (quoting Trease v. State, 768 So.2d 1050, 1055 (Fla.2000)). In Cox, the defendant argued that the trial court improperly assigned certain mitigating factors either slight or no weight. Among those factors was “the mitigating nature of the defendant’s childhood.” Id. The Cox defendant argued that the trial court had weighed mitigating factors in a similar fashion to that condemned by this Court in Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). In Nibert, the trial court had refused to consider evidence regarding the defendant’s childhood abuse. See 574 So.2d at 1062. The Court held, however, that the trial court’s refusal to consider this evidence was improper because the years of “psychological and physical abuse during the defendant’s formative childhood and adolescent years” was in no way diminished simply because it “finally came to an end.” Id.
Martin’s case, however, is unlike Nibert and analogous to Cox. In Cox, this Court noted that the trial court does not act beyond the bounds of its discretion when it “attempt[s] to place the appellant’s mitigation evidence in context.” 819 So.2d at 723.[17] Rather, a trial court acts improperly if it attempts to “enforce a nexus requirement,” which the trial court in Cox had not done. Id. As long as the record “contains competent, substantial evidence to support the trial court’s rejection of these mitigating circumstances, the trial court’s refusal to grant these ... miti-gators any weight [is] not improper.” Id. (citing Kight v. State, 512 So.2d 922, 933 (Fla.987)) (citation omitted); see also Trease, 768 So.2d at 1055 (“We hereby recede from our opinion in Campbell [v. State, 571 So.2d 415 (Fla.1990)] to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight.”).
In Martin’s case the trial court explained that there was a lack of compe *319 tent, substantial evidence to support the proposed mitigators of emotional abuse, sexual abuse, and remorse. With regard to emotional abuse, it noted: “The defendant presented anecdotal evidence that he was subject to childhood emotional abuse, but did not provide evidence showing how the alleged incidents impacted his ability to know right from wrong, or kept him from being a law abiding member of society.” With regard to sexual abuse, it noted: “The [defendant provided testimony from his mother that she suspected he had been sexually abused at a young age. She also testified she could not confirm that it had actually happened, only that she suspected it had occurred.” During trial, Martin failed to provide any corroborating evidence apart from his own testimony that he ever suffered such abuse. With regard to remorse, the trial court stated: “The defendant testified at trial that the apparent remorse he showed at the conclusion of his interview with law enforcement was insincere and an act.” During trial, Martin testified that his confession to law enforcement was actually a fabrication. He stated that he confessed to the crime because the actual killer, his drug dealer, threatened to harm Martin’s mother and girlfriend if he (Martin) revealed the actual perpetrator. Martin testified that his display of remorse was an act to convince law enforcement of his guilt and thereby protect his mother and girlfriend.
Although there was not an “absolute dearth of evidence,”[18] the trial court’s rejection of these three specific mitigators is supported by a lack of corroborating evidence in the record to support a conclusion that these mitigators deserve some weight. The trial court did not require that Martin demonstrate a nexus between the mitigating circumstances and the murder. Rather, the trial court attempted to place the circumstances of this defendant in this case in context, and because it was unable to do so, afforded them no weight. We agree with the trial court’s ruling and thus deny relief on this issue.
Psychological Mitigation Evidence
In Spann v. State, this Court held:
Mitigating evidence must be considered and weighed when it is contained anywhere in the record, to the extent it is uncontroverted and believable. This requirement applies with equal force when the defendant asks the court not to consider mitigating evidence .... (Citation omitted.) The sentencing court must “expressly evaluate in its written order each mitigating circumstance proposed by the defendant.”
857 So.2d 845, 857 (Fla.2003) (quoting Rogers v. State, 783 So.2d 980, 995 (Fla.2001)); see also Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (holding that a sentencer may not “refuse to consider, as a matter of law, any relevant mitigating evidence”) (emphasis in original). Where a trial court failed to detail its findings in a sentencing order, this Court has vacated a death sentence and remanded with instructions for the trial court to issue a new sentencing order. See Ault, 53 So.3d at 187. If a trial court details its findings on mitigation, those findings are subject to harmless-error review. Id. This Court will not disturb the “capital appellant’s sentence if it determines that an error was harmless beyond a reasonable doubt.” Id.
*320 Martin claims that the trial court erred by not considering Dr. Krop’s deposition testimony, which he states was relevant to the court’s consideration of the aggravating and mitigating factors. Dr. Krop did not testify during any phase of the trial. Instead, Dr. Krop’s deposition testimony was provided to the trial court in written form at the end of Martin’s Spencer hearing. In accordance with the law, the trial court addressed and weighed each aggravating and mitigating circumstance presented for its review. Given the trial court’s meticulous review of each of these circumstances, and the complete absence of any reference to Dr. Krop’s name in the sentencing order, we agree with Martin that the trial court may not have considered Dr. Krop’s deposition testimony. However, we conclude that any error by the trial court in its failure to review Dr. Krop’s testimony was harmless.
The sentencing order reflects that the trial court considered the same evidence that Dr. Krop’s deposition testimony addressed, but through the direct sources of the information — Martin’s family. During the penalty phase, Martin’s family testified about their suspicions regarding sexual and emotional abuse during Martin’s childhood. Although Dr. Krop performed a battery of tests on Martin from which he determined that Martin has antisocial personality disorder, many of his conclusions came from his discussions with Martin’s family members, which the trial court considered as evidenced by the sentencing order.
In addition, even if the trial court overlooked Dr. Krop’s testimony, a number of Dr. Krop’s conclusions would have undermined the trial court’s finding of mitigation evidence in favor of Martin. Dr. Krop conducted approximately a half-dozen psychological assessment tests and reported that Martin was not suffering from any “major mental illness in terms of any kind of psychotic indicia” when he killed Jacey. Dr. Krop concluded that Martin’s intelligence fell in the “average range,” and he would not testify to a statutory mitigator involving mental illness “as far as [doing so would indicate that Martin] was either under extreme duress or that he was suffering with an extreme mental illness.” Dr. Krop also diagnosed Martin with antisocial personality disorder — a diagnosis that likely would have detracted from Martin’s case for mitigation. Compare Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (likening a mental health expert’s diagnosis of antisocial personality disorder to other “unfavorable psychiatric condition[s]”), and Jones v. State, 998 So.2d 573, 585 (Fla.2008) (“This Court has acknowledged that antisocial personality disorder ‘is a trait most jurors tend to look disfavorably upon.’”) (quoting Freeman v. State, 858 So.2d 319, 327 (Fla.2003)), with Morton v. State, 995 So.2d 233, 243-44 (Fla.2008) (grouping antisocial personality disorder with other mental issues as “additional mental mitigation,” but ultimately finding that the presentation of it still would not outweigh the substantial aggravation found in the case).
Dr. Krop stated that if he testified, his opinion primarily would be that Martin comes from a “very dysfunctional family.” This dysfunctionality pertained to such issues as Martin’s problems with his stepmother, his absentee father, an alleged history of sexual abuse by an adolescent neighbor, the impact of a sexual relationship with his male roommate, and his chronic drug and alcohol abuse. Dr. Krop’s testimony, however, was not conclusive on any of the dysfunctionality issues he addressed. Dr. Krop noted that Martin’s stepmother denied some of Martin’s assertions regarding family conflict, and Dr. Krop would not state definitively *321 whether Martin was ever physically abused. With regard to sexual abuse, Dr. Krop stated that he did not have any evidence other than Martin’s own statements during their meetings to support such a finding. Dr. Krop said that he believed that Martin’s self-described “blackout state” after killing Jacey was part of a dissociative episode.
Moreover, Dr. Krop’s deposition contained other information that would have been detrimental to Martin’s case. During their second meeting, while Martin was in jail, Martin confessed to Dr. Krop that he murdered Jacey. He admitted that he killed her because he was so overwhelmed by his girlfriend’s feelings of pain. Martin then physically demonstrated for Dr. Krop and Martin’s attorney, who was also present at this meeting, how he killed Jacey. During their fourth meeting, Dr. Krop testified that Martin stated that he lied to him and also the police when he confessed to murdering Jacey, and that another man had killed her. During their fifth meeting, however, Dr. Krop stated that Martin again reversed himself and said he lied to Dr. Krop and the police when he informed them that he was not responsible for Ja-cey’s death, and had spoken truthfully during their second meeting when he confessed to her murder.
Although Dr. Krop’s testimony would have been relevant to the trial court’s consideration of aggravating and mitigating factors — including mitigators the court found unproven such as emotional abuse, sexual abuse, and remorse — we find it unlikely that had the trial court found these factors proven in light of Dr. Krop’s testimony, it would have given them anything more than slight weight. Dr. Krop testified that his findings and conclusions, apart from those derived from psychological assessment tests, were based on conversations with Martin’s mother, stepmother, father, and grandfather — testimony which the trial court heard and considered during the Spencer hearing.
Given that certain aspects of Dr. Krop’s testimony were significantly unfavorable for Martin, it is unlikely that had the trial court considered Dr. Krop’s deposition when assessing the aggravating and mitigating circumstances, it would have altered the result such that the court would have imposed a life sentence upon Martin instead of a death sentence. Thus, even if the trial court did not consider Dr. Krop’s testimony, we conclude that any error by the trial court was harmless.
Furthermore, the trial court’s sentencing order does not contain errors that warrant vacating Martin’s death sentence. In Woodel v. State, for example, this Court noted that the deficient sentencing order at issue
fail[ed] to expressly evaluate each mitigating circumstance, fail[ed] to determine whether these mitigators are truly mitigating, fail[ed] to assign weights to the aggravators and mitigators, fail[ed] to undertake a relative weighing process of the aggravators vis-a-vis the miti-gators, and fail[ed] to provide a detailed explanation of the result of the weighting process.
804 So.2d 316, 327 (Fla.2001). Here, the trial court reviewed each aggravator and mitigator presented by the State and defense. It addressed each one and explained why it was allocating a given weight to that aggravator. Accordingly, even though the trial court may have failed to consider Dr. Krop’s deposition, it does not appear to have overlooked any material evidence in reaching its conclusion. Accordingly, we deny any relief on this issue.
*322 Constitutionality
Martin challenges the constitutionality of Florida’s death sentencing scheme delineated in section 921.141, Florida Statutes (2008). He contends that it is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it permits a judge, without a jury determination of facts, to increase maximum sentences to death. This claim is without merit. This Court has repeatedly held that Florida’s capital sentencing scheme does not violate the United States Constitution under Ring. See, e.g., Abdool v. State, 53 So.3d 208, 228 (Fla.2010) (“This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and find Florida’s sentencing scheme unconstitutional.”), cert. denied, - U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).
Furthermore, “[t]his Court has repeatedly held that Ring does not apply to cases when the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.” Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011). This Court has held that the aggravating circumstance of under-sentence-of-imprisonment “may be found by the judge alone.” See Floyd v. State, 913 So.2d 564, 577 (Fla.2005). The aggravating circumstance of under-sentence-of-imprisonment also includes a person who was “previously convicted of a felony ... or placed on community control or on felony probation.” See § 921.141(5)(a), Fla. Stat. (2008) (emphasis supplied). When Martin murdered Jacey, he was under felony probation for the burglary of his mother’s home. Thus, the trial court did not act improperly when it found this aggravator even without a specific jury recommendation. See Floyd, 913 So.2d at 577.
Martin also contends that the trial court’s finding of a felony-murder aggravator does not support his death sentence. We disagree. Section 921.141(5)(d), Florida Statutes (2008), states that an aggravating circumstance is established where the “capital felony was committed while the defendant was engaged ... in the commission of ... or flight after committing ... [a] robbery....” The jury unanimously convicted Martin of committing a robbery with a deadly weapon. Ring only requires that at least one aggravator exist. See State v. Steele, 921 So.2d 538, 546 (Fla.2005). During the sentencing phase, the trial court found that Martin was engaged in the commission of a robbery with a deadly weapon when he murdered Jacey because Martin killed Jacey with a hammer so that he could take her vehicle and personal items, including her ATM card, and use them as his own.
Although this Court has reduced death sentences to life imprisonment where the underlying felony was the only aggravator, see Rembert v. State, 445 So.2d 337, 340-41 (Fla.1984) (vacating the death sentence where murder occurred during the commission of a felony, but also disagreeing with the trial court’s finding of the aggra-vators of CCP and heinous, atrocious, and cruel (HAC)), this is not the case here. In addition to the felony-murder aggravator, two other aggravators — Martin’s felony-probation status and CCP — supported the trial court’s ruling.
Accordingly, we conclude that Martin’s Ring challenge is wholly without merit, and we deny relief on this issue.
Proportionality
Recently this Court described our obligation in conducting a proportionality review:
*323 Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In determining whether death is a proportionate penalty in a given case, we have explained our standard of review as follows:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and miti-gator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). Thus, our proportionality review requires that we discretely analyze the nature and weight of the underlying facts; we do not engage in a “ ‘mere tabulation’ of the aggravating and mitigating factors.” Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Francis v. Dugger, 908 F.2d 696, 705 (11th Cir.1990)).
Scott v. State, 66 So.3d 923, 934-35 (Fla.2011).
Here, the jury recommended that Martin be sentenced to death for Jacey’s murder by a vote of nine to three. The trial court found three aggravating circumstances, each of which it gave great weight: (1) commission by a convicted felon and one who is under a sentence of felony probation; (2) committed during the course of a robbery; and (3) CCP. These aggravators were weighed against two statutory mitigators — Martin’s age and any other factors in Martin’s background that would mitigate against imposition of the death penalty. It weighed these factors as follows: (1) Martin’s age (no weight); (2) emotional abuse (no weight); (3) sexual abuse (no weight); (4) led law enforcement to the crime scene and location of Jacey’s body (no weight); (5) failure of the system (no weight); (6) lack of impulse control (no weight); (7) has a reason to do well in prison (no weight); (8) exhibited a lack of sophistication in the way the crime was committed (no weight); (9) showed remorse (no weight); (10) drug abuse — suffered from substance abuse during his adolescent and adult life (slight weight); (11) lack of positive role models and the lack of the benefit of stable and nurturing parents during Martin’s formative years (slight weight); (12) lack of a violent history (slight weight); (13) incident was situational and his apparent behavior was an isolated incident (slight weight); and (14) has family members who are concerned and love him (slight weight).
The court also addressed six non-statutory mitigating circumstances. It made the following findings: (1) performed kind deeds for others (slight weight); (2) shares love and support with his family who continues to love him (slight weight); (3) attempted to have a positive influence on family members despite his incarceration (slight weight); (4) has artistic skills (slight weight); (5) cares about animals (slight weight); and (6) is amenable to rehabilitation and a productive life in prison (slight weight).
Precedent supports Martin’s death sentence as proportionate given that the trial court found three aggravators, all of which it gave great weight, and one of *324 which was CCP. In Wright v. State, this Court noted that the “CCP aggravator is one of the most serious aggravators provided by the statutory scheme,” and upheld the imposition of death where the trial court found four statutory aggrava-tors and three statutory mitigators. 19 So.3d 277, 304 (Fla.2009). In that case, the defendant had obtained a firearm in advance of abducting his victims, drove them to a remote location, and then shot them execution style. Id. at 299.
Similarly, evidence presented at Martin’s trial suggested that over the course of the day, Martin executed his plan to steal Jacey’s car and kill her. Martin invited Jacey to spend the evening with him by sending her a series of text messages and calling her. Once they were together, he took her to a remote location where he murdered her with a hammer. Although the murder weapon was not recovered, Martin confirmed during the interview that the toolbox police found in Jacey’s vehicle was his, and that he threw the hammer he used to kill Jacey into a river. Thereafter, Martin hid Jacey’s body in the bushes and proceeded to use her vehicle and other belongings until he was apprehended by law enforcement nine days later.
Moreover, the trial court found two other aggravators in addition to CCP: (1) commission by a convicted felon and one who is under a sentence of felony probation; and (2) committed during the course of a robbery. This Court has affirmed the imposition of death as a proportionate penalty when a finding of CCP was coupled with other aggravators in addition to multiple mitigating factors. See Mosley v. State, 46 So.3d 510, 527-29 (Fla.2009) (holding death penalty proportionate where the trial court found CCP and three other aggravators and twenty-nine non-statutory mitigators); Zakrzewski v. State, 717 So.2d 488, 494 (Fla.1998) (holding imposition of the death penalty proportionate where the trial court found two aggravating circumstances, CCP and contemporaneous murder, two statutory mitigating factors, and “a number of nonstatutory mitigating factors”).
This Court’s discussion of mental health mitigation in Wright does not counsel against imposition of the death penalty in Martin’s case. In Wright, this Court noted that if mental health mitigation “reveals a mentally disturbed defendant, [this Court has] vacated the death penalty under appropriate circumstances even when the heinous, atrocious, and cruel aggravating circumstance was found.” 19 So.3d at 304. These circumstances, however, involved cases where “only a single aggravator was found.” Id. (citing Offord, 959 So.2d at 192). In the instant case, the trial court found three aggravators, and questionable mental mitigation evidence. Dr. Krop, the one expert whose findings were provided to the trial court, stated that he would not testify that Martin, at the time of the offense, was under extreme duress or was suffering with an extreme mental illness. Dr. Krop believed that Martin had a history of being sexually abused by a neighbor, but these findings were based only on Martin’s self reports and Martin’s mother’s suspicions, and not confirmed by outside records.
In addition, Martin’s age as a mitigating factor does not persuade us that the death penalty is disproportionate here. Martin was twenty-one years old at the time he committed this murder. Despite Martin’s age, the trial court imposed a death sentence. In Philmore v. State, this Court upheld the death penalty where a judge imposed death even though the defendant was twenty-one at the time of the crime. See 820 So.2d 919, 940 n. 5 (Fla.2002). This Court noted that the trial court had *325 found that the Philmore defendant “acted in a mature manner and showed ‘criminal sophistication’ in carrying out the crimes.... ” Id.; see also Evans v. State, 808 So.2d 92, 109 (Fla.2001) (holding the death penalty proportionate where the nineteen-year-old defendant failed to establish that he was immature at the time of the murder, and the record established that he was the “mastermind” behind the murder). In Martin’s case, the trial court made similar findings, noting that Martin “made statements both to law enforcement during his interview and to the jury at trial that demonstrated a level of sophistication, intelligence and understanding that directly rebutfted] the claim that his age is a mitigating factor.”
The death penalty is proportionate because Martin lured an unsuspecting young woman to a remote area as part of a carefully crafted and preconceived plan to steal a car and murder its owner to visit his girlfriend. Before he executed his plan, he discussed it with his then-girlfriend. Martin brought Jacey to a deserted area before he beat her to death with a hammer, hid her body, and disposed of the murder weapon and Jacey’s cell phone. After killing Jacey, Martin proceeded to use her car and other personal effects over the course of the next nine days until he was apprehended by law enforcement for shoplifting. Although Martin initially pretended to not know anything about Jacey’s whereabouts and to be concerned for her welfare, he then confessed to murdering her and directed law enforcement to where he left her body.
In light of the foregoing, we affirm Martin’s sentence of death as proportionate.
Sufficiency of the Evidence
Although not raised by the parties, this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake, 972 So.2d at 850; Fla. R.App. P. 9.142(a)(5). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
Sufficient evidence exists in the record for the jury to convict Martin of first-degree premeditated murder and armed robbery. The record reflects that Martin had a discussion with his girlfriend about killing someone, stealing that person’s car, and then hiding the body in a cemetery. On the day of the murder, Martin exchanged phone calls and numerous text messages with Jacey regarding their plans later that evening to spend the night together. Martin then took Jacey to an isolated location where he killed her with a weapon that he had brought to the scene. After killing Jacey, Martin stole her car and proceeded to use it and her other personal effects until he was apprehended nine days later. Martin admitted to law enforcement and the forensic psychologist Dr. Krop that he killed Jacey with a hammer. Forensic analysts testified that the injuries Jacey suffered were consistent with wounds from such a weapon.
Accordingly, we find sufficient evidence to support Martin’s convictions of first-degree murder and armed robbery.
CONCLUSION
Based on the foregoing, we affirm Martin’s convictions and sentences.
It is so ordered.
*326 POLSTON, C.J., and LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The record does not indicate how Janeen and Jacey were related.

. This phrase is taken directly from the trial court's sentencing order.

. In the sentencing order, the trial court noted that Martin testified he confessed and assisted police because he believed he would not be harshly punished, not because he wanted to help find Jacey.

. The trial court noted that the justice system provided Martin with educational and rehabilitation opportunities, but Martin failed to comply with the terms and conditions of those opportunities.

. The trial court did not find this mitigator proven because Martin lured Jacey to an isolated area, then killed her, and hid her body.

. The trial court noted that Martin testified that the remorse he showed during the police interview was insincere and an act.

. This Court was able to observe when and how Martin allegedly invoked his right to remain silent because a DVD of the interview was provided. The statement was fleeting in nature and immediately followed by Martin’s continued engagement with the detectives. Although we conclude that the statement itself was neither a clear nor unambiguous invocation such that the detectives would have been on notice that Martin had just invoked his right to remain silent, we also note that the manner in which Martin articulated the disputed statement further supports our conclu-

. The transcript refers to Detectives Wolcott and West as "Det.” and "Other Det." In general, "Det." refers to Detective Wolcott and "Other Det." to Detective West. These references, however, are not consistent throughout the entire transcript. Because the speaker of the cited interview portions is immaterial to the legal conclusions this Court has reached, we treat "Det.” as Detective Wolcott and "Other Det.” as Detective West in this opinion.

. The parties dispute the precedential authority of Brewer given that it cited Bram v. United States, 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed. 568 (1897), which held, among other points, that "a confession cannot be obtained by ‘any direct or implied promises, however slight, nor by the exertion of any improper influence.’ ” Arizona v. Fulminante, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In Fulminante, the U.S. Supreme Court stated that under current precedent this passage from Bram does "not state the standard for determining the volun-tariness of a confession.” Id. This Court, nevertheless, has continued to rely on Brewer, in which it addressed the voluntariness of confessions for other points of law, despite the decision’s reliance on Bram. See Blake v. State, 972 So.2d 839, 844 (Fla.2007) (noting the impermissible interrogation tactics used in Brewer); cf. Rigterink v. State, 66 So.3d 866, 887 (Fla.2011); Day v. State, 29 So.3d 1178, 1180 (Fla. 4th DCA 2010).

. Conversely, in Brewer, the interrogating detectives’ primary goal was to find (and assist in the conviction of) a suspected murderer. See 386 So.2d at 234-36.

13. During the interview, the detectives showed Martin a tree diagram, which depicted the degree of homicide with first-degree murder at the top and the less-severe justifiable homicide toward the bottom.

14. Again, the detectives are referring to the homicide tree diagram addressed in footnote 13.

. Defense also notes the following statement by Detective Wolcott: "My biggest fear is that time is ticking for me to leave and I won’t have another opportunity to talk to [you] and when I walk back you are going to [be] thinking, oh man I should have told him. And my agency is not going to allow me to come back. Because there is so much more they are going to want me to do. Tell me where she is at so that I can go get her.”

. The First District noted that the defendant asked the detective how the detective would help him "at least ten times.” See Ramirez, 15 So.3d at 855.

. This Court in Cox held that the trial court did not exceed the bounds of discretion when it stated the following: "While the evidence supports the existence of [the defendant’s] heightened anxiety in dealing with other people, the evidence does not support any conclusions or even speculations as to how it contributed to Mr. Cox’s decisions and actions that led to [the victim's] death.... Thus, while established by Dr. McMahon’s opinion, the court declines to afford any weight to this circumstance.” Cox, 819 So.2d at 723 n. 15 (quoting the trial court’s sentencing order).

. In Cox, this Court affirmed the trial court’s assignment of no weight to certain mitigators because of an "absolute dearth of evidence contained in the record.” 819 So.2d at 723. Martin's mother testified that Martin spent six weeks in a psychiatric facility when he was seven, and that his father left him when he was thirteen. Martin's mother also testified that she was an alcoholic and this created a disruptive home environment.